## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PARAG G. PATIL, M.D., Ph.D.,

      Plaintiff,

v.                                                                  CASE NO. 23-cv-10631-MAG-DRG
                                                                    Hon. Mark A. Goldsmith
THE BOARD OF REGENTS OF THE                                         Mag. Judge David R. Grand
UNIVERSITY OF MICHIGAN,
MARIE LOZON, M.D., Individually,
KARIN MURASZKO, M.D., Individually,
and STEPHEN SULLIVAN, M.D.,
Individually,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT AND
## RELIANCE ON DEMAND FOR TRIAL BY JURY

**NOW COMES** Plaintiff, PARAG G. PATIL, M.D., Ph.D., by and through

his attorneys, CUMMINGS, McCLOREY, DAVIS & ACHO, PLC by RONALD G.

ACHO, JAMES R. ACHO and MIDWEST LEGAL PARTNERS, LLC, by SAIF R.

KASMIKHA, and for his Second Amended Complaint against Defendants, states as

follows:

# I. INTRODUCTION

1.      The Plaintiff, Dr. Parag G. Patil, is a humble and unassuming, yet world-renowned Neurosurgeon, who seeks justice from this Court against financially and politically powerful Defendants, University of Michigan and certain members of its Administration.

2.      Dr. Patil has been an employee of the University of Michigan and its Health System, Michigan Medicine, without interruption since he completed his Neurosurgery Residency training in 2005.

3.      This Complaint lays out, in very specific and detailed fashion, how the Defendants, in violation of Defendant's own policies, the United States Constitution, Federal Statutes, and State of Michigan Statutes, persecuted and retaliated against the Plaintiff after he raised concerns regarding administrative actions, lack of transparency and accountability, and discrimination experienced at University of Michigan.

4.      The length and detail of the Complaint are necessary for the Court to fully grasp the extent of Defendants' unlawful actions and efforts to destroy a twenty-four year, unblemished, award-filled medical career with impunity.

## II. PARTIES

### A. The Plaintiff

5.     Plaintiff, Parag G. Patil, M.D. Ph.D., (hereinafter referred to as "Dr. Patil") at all times relevant, was a resident of the County of Washtenaw, State of Michigan.

### B. The Defendants

6.     The University of Michigan (hereinafter referred to as "U of M") is a public research university organized and existing under the laws of the State of Michigan, principally located in the City of Ann Arbor, County of Washtenaw, State of Michigan.

7.     Michigan Medicine, also called University of Michigan Health System or UMHS (hereinafter referred to as "U of M") is the academic medical center of U of M, principally located in the City of Ann Arbor, County of Washtenaw, State of Michigan.

8.     Defendant, The Board of Regents of the University of Michigan (hereinafter referred to as "U of M"), is a body corporate, with the right to be sued, vested with government of the University of Michigan.  MCL §390.3 and §390.4.

9.      Defendant, The Board of Regents of the University of Michigan is located in the City of Ann Arbor, County of Washtenaw, State of Michigan.

10.      Defendant, Marie Lozon, M.D. (hereinafter referred to as "Defendant Lozon"), was at all relevant times employed by Defendant, The Board of Regents of the University of Michigan through Michigan Medicine as Chief of Staff, in the City of Ann Arbor, County of Washtenaw, State of Michigan.

11.      Defendant, Karin Muraszko, M.D. (hereinafter referred to as "Defendant Muraszko"), was at all relevant times employed by Defendant, The Board of Regents of the University of Michigan through Michigan Medicine as Chair of Neurosurgery, in the City of Ann Arbor, County of Washtenaw, State of Michigan.

12.      Defendant, Stephen Sullivan, M.D. (hereinafter referred to as "Defendant Sullivan"), was at all relevant times employed by Defendant, The Board of Regents of the University of Michigan through Michigan Medicine as Neurosurgery Chief of Service, in the City of Ann Arbor, County of Washtenaw, State of Michigan.

### C. Place of Employment

13.    At all relevant times the address at which the Plaintiff was employed by the Defendant, University of Michigan, has been: 1500 Medical School Drive, SPC 5338, Ann Arbor, Washtenaw County, Michigan 48109-5338.

### III. BASIS FOR JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This action is authorized and instituted pursuant to 42 U.S.C. § 12117(a), 42 U.S.C. § 200e5(f)(1) and (3) and 42 U.S.C. § 1983, with counts arising under the United States Constitution and Federal Law.

15.    Dr. Patil filed a charge of discrimination on the basis of disability, sex, race/national origin and retaliation with the Equal Employment Opportunity Commission (EEOC) within 300 days of the commission of the unlawful employment practice alleged in this claim.

16.    Dr. Patil received notification of the right-to-sue letter on February 1, 2023 and has filed this Complaint within 90 days of receiving the EEOC's notice of right to sue.

## A. Federal Counts

17.     Plaintiff brings Federal Counts under the Americans with Disabilities Act of 1990, 42 U.S.C §12101 *et seq*.

18.     Plaintiff brings Federal Counts under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

19.     Plaintiff brings a Federal Count under 42 U.S.C. § 1983 for violation of Due Process, Property and Liberty rights under the United States Constitution, Fourteenth Amendment.

20.     Plaintiff brings a Federal Count under 42 U.S.C. § 1983 for violation of his rights of Freedom of Speech under the United States Constitution, First Amendment.

## B. State Counts

21.     Plaintiff additionally brings State Counts under the Michigan Persons with Disabilities Civil Rights Act, M.C.L. §37.1101 *et seq*, the Michigan Elliott-Larsen Civil Rights Act, M.C.L. 37 § 2101 *et seq.,* and the Bullard Plawecki Employee Right to Know Act, M.C.L. §432.501 *et seq.,* and common law claims of Breach of Contract, Invasion of Privacy, Defamation, and Intentional Infliction of Emotional Distress.

5

## C. Amount in Controversy

22.    The amount in controversy herein exceeds $75,000.00 exclusive of interest, costs, and attorney fees.

## D. Venue

23.    Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(1). The Plaintiff and all Defendants, whether individuals or entities, are domiciled or subject to this Court's personal jurisdiction with respect to the civil action in question.

## IV. STATEMENT OF FACTUAL BACKGROUND

## A. Dr. Patil is a world-renowned Neurosurgeon with an impeccable record and reputation.

24.    Plaintiff, Parag G. Patil, M.D., Ph.D. ("Dr. Patil") is an acknowledged *world-renowned Neurosurgeon* who has practiced at U of M since 2005.

### 1. Achievements and Honors

25.    In pursuit of his dream to serve the community and to advance the field, Dr. Patil engaged in 20 years of post-secondary education at prestigious colleges and medical institutions, including the Massachusetts Institute of Technology, Oxford

6

University, Johns Hopkins University, Duke University, and the University of Toronto.

26.    During this time, Dr. Patil received **_numerous prestigious awards_** for his research and teaching.

27.    Dr. Patil is world-renowned for his clinical and translational research and work to advance the highly complex and multidisciplinary field of Restorative Neuroengineering.

28.    Since 2010, Dr. Patil has been a Diplomate of the prestigious American Board of Neurological Surgery and Fellow of the American Association of Neurological Surgeons.

29.    Because of his nationally and internationally recognized neurosurgical expertise, Dr. Patil was recruited to serve as an expert witness for the U.S. Department of Justice, the State of Michigan Department of Licensing and Regulatory Affairs, and Statewide Physician Review Organizations.

30.    Prestigious organizations, including the National Institutes of Health (N.I.H.), the National Science Foundation (N.S.F), the Craig H. Neilsen Foundation, and industry have supported his research with twenty-eight (28) active and completed grants, valued at over $30 million.

31.     Dr. Patil has authored over two hundred publications and is a highly sought-after public speaker. He lectures throughout the world as a regularly invited speaker at international meetings in North America, South America, Europe, and Asia.

32.     The achievements mentioned above clearly illustrate Dr. Patil's prominence, making what was done to him at the hands of Defendants U of M and Administrators, so repulsive and incomprehensible.

## 2. Professional Service

33.     Dr. Patil is currently an Associate Professor with Tenure of Neurosurgery, Neurology, Anesthesiology, and Biomedical Engineering at U of M.

34.     Dr. Patil and his colleagues have established and led nationally recognized multi-disciplinary Clinical Programs in deep brain stimulation, pain neuromodulation, and cancer pain.

35.     Dr. Patil has led and participated in countless initiatives to secure philanthropic donations, to establish U of M as a leader in Restorative Neuroengineering, to revamp the Neurosciences at U of M, and to establish the Michigan Neurosciences Institute.

36.     Within the Department of Neurosurgery, Dr. Patil has also worked to promote and support the research activities of his neurosurgical colleagues, as Associate Chair for Clinical and Translational Research, as Co-Director of the Neuroscience and Sensory Clinical Trials Support Unit, and as a longstanding member of IRBMED (Institutional Review Board).

37.      In addition, Dr. Patil serves as Director of U of M Stereotactic and Functional Neurosurgery Fellowship, as a member of numerous National and International Grant Review Panels (including the National Institutes of Health and National Science Foundation), and the Peer-Review Panels and Editorial Boards of numerous Clinical and Academic Journals.

38.     With these and other major efforts, Dr. Patil has built an impeccable National and International reputation.

### 3. Clinical Excellence

39.     From any objective standpoint, Dr. Patil has an unblemished record of clinical excellence.

40.     Over eighteen (18) years at U of M, any audits, and/or reviews for insurance approval and billing purposes, and reviews by Risk Management/Office

of Clinical Safety have raised __*no*__ practice or documentation concerns, other than typical routine matters.

41.    During his entire professional career, 1999 to 2023, Dr. Patil has __*never*__ had a single medical malpractice claim or lawsuit.

42.    Dr. Patil has experienced __*no*__ significant patient complaints about his care, including any by patients who may have experienced complications.

43.    Dr. Patil's relationships with patients are, and always have been, excellent.

44.    All objective measures of performance, as a physician, have similarly raised no concerns.

45.    On the most recent 24-month report, his Ongoing Professional Practice Evaluations (OPPE) scorecard for Patient Care, Professionalism, Patient Experience, and National Database Indicators __*met or exceeded Peer Scores*__.

46.    As expected, in May 2018, the Neurosurgery Chief of Service at U of M, Defendant Sullivan, commented that Dr. Patil has: "High marks on outcomes, patient experience, and professionalism." As late as January 2019, the comment was "Very nice performance all around."

10

**B. Dr. Patil reported disturbing practices and policy violations at the University of Michigan.**

47.     The matter before the Court today arises because of mistreatment of Dr. Patil by the Defendants, despite his impressive and outstanding clinical, research, education, and service accomplishments.

48.     Since joining the U of M faculty in 2005, and despite his acknowledged success, Dr. Patil has been subjected to disturbing administrative practices in the Department of Neurosurgery and Office of Clinical Affairs, particularly related to transparency and accountability.

49.     From 2010 to 2019, Dr. Patil appropriately and repeatedly met with U of M leadership to raise concerns regarding these issues.

50.     As early as January 10, 2010, Dr. Patil shared these concerns confidentially with Medical School Dean James Woolliscroft, but nothing was corrected.

51.     Following this meeting with the Dean, the attitude towards Dr. Patil of the Neurosurgery Chair, Defendant Muraszko, changed suddenly and markedly. At their next meeting, Defendant Muraszko exclaimed, ***"You must hate me!"***

52.     The negative impact of sharing his concerns with the Dean intimidated Dr. Patil. Both his career and his compensation irreversibly suffered. Dr. Patil was

denied promotion and tenure in 2012. Without tenure, Dr. Patil's faculty position was subject to annual renewal by Defendant Muraszko. Feeling powerless and under constant fear of further retaliation, Dr. Patil's career continued to suffer with inability to receive promotion or tenure for three years, and ongoing threats to remove laboratory space after years of delay in providing it in the first place.

53. The experience of retaliation had a chilling effect upon Dr. Patil's willingness to speak out against ongoing and concerning administrative actions. However, once he eventually received tenure in 2015, though only after the intervention of outside Chairs and Deans, Dr. Patil's principles compelled him to try again.

54. On June 1, 2015, after being awarded tenure, Dr. Patil contacted the Medical School Ombuds with bias/discrimination concerns and asked if he should contact the Office of Institutional Equity (OIE). Unfortunately, Dr. Patil received no reply. When those empowered to help ignored outreach, it again had a chilling effect on Dr. Patil's ability to speak on his behalf and that of his colleagues.

55. On August 15, 2018, on the strong recommendation of a high-level Defendant administrator who voiced concern over Dr. Patil's experiences and treatment by Defendant Muraszko, Dr. Patil met with the University Ombuds, who arranged a meeting with University Academic Human Resources.

12

56.     Between the period of August 2018 and April 2019, and as detailed below, Dr. Patil shared his concerns regarding discriminatory practices, hostile work environment, retaliation, and other administrative practices with multiple University representatives in multiple University departments.

57.     All efforts made by Dr. Patil to raise his concerns were done pursuant to U of M reporting policies and procedures.

58.     Despite these repeated and on-going efforts by Dr. Patil to report concerning conduct including bullying, scapegoating, discrimination, coercion, and retaliation by U of M administrators, those tasked with investigating and addressing this conduct instead either ignored his efforts, or, incredibly, encouraged him not to put his concerns in writing and warned him of potential retaliation.

59.     For example, on April 11, 2019, Dr. Patil met with Chair of Neurosurgery Defendant Muraszko, the Chief of Staff Defendant Lozon, and Medical Staff Quality Administrative Manager Maureen Naszradi.

60.     During that meeting, Ms. Naszradi, responding to a report of unprofessional behavior filed by Dr. Patil on February 7, 2019, said that she had never received a safety report in which a senior faculty reported a Chair (Defendant Muraszko) and Chief of Service (Defendant Sullivan) for unprofessional behavior and that ***she wished that Dr. Patil had not said it created a "hostile work***

13

***environment."*** Contrary to U of M policy, Ms. Naszradi recommended that, in the future, Dr. Patil should call her and tell her rather than making a formal written report.

61.     In follow up to this intimidating meeting, Dr. Patil requested and met privately with the Chief of Staff of Michigan Medicine, Defendant Lozon, on May 2, 2019, to report concerns once again, particularly as they relate to U of M's Office of Clinical Affairs (OCA) and his fears of retaliation. Dr. Patil's fears subsequently came true.

62.     At a February 22, 2019 meeting, Executive Vice Dean for Academic Affairs (EVDAA) Bradford warned Dr. Patil of possible danger and retaliation in response to his sharing concerns. Specifically, she informed Dr. Patil, "I cannot protect your anonymity, and although we have rules against retaliation, it does happen." She added, "Do you think I can change Karin? [Defendant Muraszko] Do you think that I can fire her, or show this [packet] and tell her to change? Do you think I can change her? If I show this to Karin, things will just get worse for you."

63.     Dr. Patil's reported concerns not only remain unaddressed but also provide background to subsequent retaliatory actions against him.

64.     Since his reports to leadership, a series of orchestrated events have occurred by U of M and Defendants, and arguably others, to discredit Dr. Patil.

14

65.     It was only after his criticisms of U of M that the attacks and retaliation began to intensify by both U of M and the individual Defendants.

**C. Dr. Patil raised specific and objective concerns supported by documentation.**

**1. Unfair Compensation and Stifled Promotion**

66.     During his recruitment to U of M in 2005, Dr. Patil was verbally promised a compensation goal at the American Association of Medical Colleges (AAMC) 75th percentile and 50% protected research time. This is very significant.

67.     As his initial compensation was set below the 50th percentile, this inadequate compensation was a common topic of discussion at annual reviews with Defendant Muraszko, Chair of the Department of Neurosurgery.

68.     At multiple meetings, Defendant Muraszko agreed with Dr. Patil's compensation expectation of at least the AAMC 50th percentile and documented this in writing.

69.     Disturbingly, following Dr. Patil's 2010 meeting with Dean Woolliscroft, complaining about his compensation level, his compensation declined. In absolute terms it dropped from the 50th percentile to below the 25th AAMC percentile, which is a major drop.

70.    Dr. Patil's salary growth then, rather than being raised, was sharply curtailed from 2010 onwards.

71.    Dr. Patil was aware of his market value and secured an outside academic offer at the AAMC 75th percentile compensation level, but because of his love of U of M, he chose to remain there.

72.    As an example of retaliation by Defendant Muraszko, following his complaint about compensation, she only half-heartedly supported his promotion to Associate Professor in 2011 and 2014. Dr. Patil was denied promotion and tenure in 2012. And in 2015, after being denied in committee and after Defendant Muraszko stated Dr. Patil should look for jobs elsewhere, Dr. Patil's promotion and tenure were approved through the initiative and outside intervention of multiple other Departmental Chairs and College Deans.

73.    But even then, promotion to Associate Professor came without any increase in total compensation to Dr. Patil.

74.    During the 2015 Performance Evaluation, Defendant Muraszko, discriminatorily and inaccurately reported a negative Direct Contribution Margin to Dr. Patil for his practice.

75.    Dr. Patil showed Defendant Muraszko that her calculation was inaccurate because it failed to include any revenues from his research grants or DBS

16

program contributions to the Department. This was unfairly, and discriminatorily, ignored by Defendant Muraszko.

76.     When Dr. Patil requested an Equity Evaluation at his December 14, 2017, annual review, Defendant Muraszko shockingly, and unlawfully, told him, "*You are the wrong race and the wrong sex to have equity in compensation.*"

77.     Dr. Patil discussed the situation with a U of M Ombuds who recommended a meeting with U of M's Academic Human Resources.

78.     At this meeting, the disparities in compensation between Dr. Patil and Department colleagues of the same academic rank were revealed.

79.     It became apparent that clinical revenue alone determined compensation levels in the Department, and that Dr. Patil's 50% protected research time appointment, hospital-financed program overheads, all grant supported effort and indirects (18% FTE support), medical school administrative appointments (5% FTE support), and medical school teaching appointment (10% FTE support) were treated as nothing.

80.     Although Academic Human Resources recommended a report to the Dean, Dr. Patil elected to discuss the issue first with Defendant Muraszko, fearing further retaliation otherwise.

17

81.     However, the meeting with Defendant Muraszko, even though it took place, was ended by the Chair before compensation was ever discussed.

82.     When the Department later initiated a Compensation Redesign Workgroup, Dr. Patil took part and was disturbed to recognize that the metrics used to determine compensations levels would only serve to lock in the status quo. Dr. Patil sent a letter of concern to Defendant Muraszko, which she improperly ignored.

83.     The new Compensation Plan was pushed through. When Dr. Patil wrote again, rather than addressing his concerns, Defendant Muraszko improperly wrote that the Plan "as written was final."

84.     At a meeting on July 9, 2019, Dr. Patil restated his concern to Defendant Muraszko, and the Defendant said she would agree to an eight percent (8%) per year increase in compensation for each of the next three years. This appeared to be a reasonable start, at first glance.

85.     However, Defendant Muraszko, in a discriminatory and dishonest fashion, implemented this so-called increase by increasing salary but then ***decreasing Dr. Patil's guaranteed bonus, to produce a net-zero increase in overall compensation***.

86.     Furthermore, Defendant Muraszko later unilaterally revised the Agreement from a three-year series of raises to a single year "increase."

18

87.     Despite his enormous success, Dr. Patil received no increase in compensation in four years (FY 2019 to FY 2023) without any stated or written explanation as to why.

88.     U of M's typical Merit Program (routine salary increase) is 3%. For FY 2023, the Merit Program was increased to 4.5%. ***Dr. Patil received no routine salary increases.***

89.     Over the past decade, since FY 2012, Defendants Muraszko and U of M increased Dr. Patil's compensation by only one-half percent (0.5%) per year, far below annual inflation (2.4%) or the average rate of neurosurgical compensation increases (5%) during the same period.

90.     In addition, because of ongoing actions by Defendant Muraszko and Defendant U of M, any and all further promotion for Dr. Patil from Associate to Full Professor has also stalled, despite his international reputation and meeting all objective metrics for a rank of Full Professor.

## 2. Unequal Access to the Operating Room

91.     After the negative Direct Contribution Margin report in FY 2015, Dr. Patil repeatedly presented practice analyses to Defendant Muraszko that demonstrated his need for additional operating room access to generate the desired

19

contribution margin and to support the compensation level that he had been promised.

92.     Access to the operating room is critical for Neurosurgeons to perform surgery, to build clinical programs, and to generate revenue.

93.     Dr. Patil made repeated requests to Defendant Muraszko for additional operating room access during multiple annual reviews over several years, underscoring that highly compensated colleagues were provided with greater operating room access.   Those requests remained unanswered by Defendant Muraszko.

94.     On December 14, 2017, Dr. Patil again requested, and Defendant Muraszko reluctantly verbally agreed to, additional Tuesday operating room time. However, written confirmation was not provided to Dr. Patil, and when Dr. Patil sought to update the allocation software to allow the new scheduling, Defendant Muraszko, in retaliation against Dr. Patil, reversed her decision without acknowledging the earlier agreement.

95.     Facing pressure to increase clinical revenue, Dr. Patil continued to request additional Tuesday operating room time.

96.     On January 10, 2019, Defendant Muraszko again reluctantly agreed to (less frequent) additional Tuesday operating room time, which Dr. Patil confirmed in writing.

97.     However, Defendant Muraszko, once again, unfairly reversed herself. This second reversal placed Dr. Patil into an extremely uncomfortable situation and damaged trust with Defendant Sullivan, the Chief of Service, since the Defendant Muraszko apparently wrote to Defendant Sullivan that she "had no idea" why Dr. Patil thought he could schedule cases on Tuesdays.

### 3. Fraudulent Federal Effort Reporting

98.     The Federal Government requires all colleges and universities that receive federal funding to maintain a system of internal control, which provides reasonable assurance that charges to federal awards are accurate, allowable, and properly allocated.

99.     U of M employees who allocate their effort to one or more sponsored projects or cost sharing related to sponsored projects must certify their effort in accordance with these federal requirements.

100.     In addition, Medical School faculty members who hold an MD must certify their effort per the Medicare Provider Reimbursement Manual.

101.    For 2017 and 2018, Dr. Patil's effort allocation report remained inaccurate and without correction by Department Administration, although Dr. Patil requested correction both verbally (on multiple occasions) and in writing (8/15/17, 8/29/17, 6/28/18, 7/10/18, and 8/18/18).

102.    In 2020, Dr. Patil requested clarification on how to complete effort certification during suspension from clinical practice. Defendant Muraszko wrote on August 17, 2020, that she would talk to the Office of Clinical Affairs but did not provide additional guidance that year.

103.    For 2021, Dr. Patil again requested guidance in a letter to Defendant Muraszko on August 13, 2021, but she did not respond to his request.

104.    Though stating in writing that errors in reporting would be corrected, Defendant U of M not only failed to make corrections but also pressured Dr. Patil to certify these false reports.

105.    Dr. Patil has refused to falsely certify his effort. His effort report therefore remains uncertified from 2019 to the present.

## 4. Unjust Restriction of Patient Referrals

106.   For an academic Neurosurgeon, the assignment of referred patients is critical to case mix, maintenance of operative skills, and ultimately case volume and compensation.

107.   For 17 years, Dr. Patil has successfully treated patients with a broad range of conditions, spanning functional neurosurgery (movement disorders, persistent spinal pain syndrome, cancer pain), neuro-oncology (benign and malignant brain tumors), degenerative spine disease, and trauma. Dr. Patil has consistently received excellent patient feedback for his care.

108.   As long ago as 2016, Dr. Patil raised concerns regarding imbalanced and unfair assignment of referrals to Department administration, including Defendant Muraszko and Functional Section Chief Dr. Sagher. Dr. Patil was assured that these errors would be corrected.

109.   However, in 2019, when imbalance remained, and Dr. Patil again raised awareness that the referral allocation was imbalanced, his concerns were immediately dismissed.

110.  In further evidence of discrimination and retaliation, Dr. Patil discovered that the referral office had been told "from above" that brain tumor referrals were to exclude Dr. Patil.

23

111.   This was particularly surprising since Defendant Muraszko had ostensibly offered Dr. Patil administrative leadership of the brain tumor program in January 2019.

112.   When Dr. Patil followed up, the Staff referred Dr. Patil to Defendant Muraszko for another follow-up. Defendant Muraszko never responded to Dr. Patil's request to explain the referral process.

### 5. Neglected and Inaccurate Annual Performance Evaluations

113.   Policy 04-06-041, Institutional Requirements for Medical Staff Members, Clinical Program Trainees, and Physician Assistants, requires an Annual Performance Planning & Evaluation Review.

114.   This Review is necessary to assess the accomplishments of a member of the Medical Staff during the preceding fiscal year (July 1 - June 30), completed by the Department Chair (Defendant Muraszko) and the Clinical Faculty Member (Dr. Patil) by September 1 of each year.

115.   The Annual Performance Review includes at least an assessment of competence, completion of institutional requirements, a plan for development, and the establishment of goals for the next review period.

24

116.   For Dr. Patil, Annual Evaluations were not performed in a timely fashion, if at all, over multiple years.

117.   There was no Evaluation scheduled for Dr. Patil in 2014, 2020, or 2021. Written feedback was not provided in 2017 or 2018 (some comments for 2017 were provided two years later in December 2019).

118.   Improperly, the Annual Evaluations by Defendant Muraszko were not provided in advance, were not accompanied by written comments, and comments from Defendant Muraszko were added later that were not discussed during the meeting.

119.   As the Evaluation Policy was not implemented as intended, Annual Evaluations were inaccurate, particularly with respect to financial data, over multiple years.

120.   Prior to Dr. Patil raising administrative complaints (including the failure to follow Policy 04-06-041) to U of M Administrators regarding Departmental practices, these Annual Evaluations never indicated any performance concerns for Dr. Patil.

**6. Further punitive measures in 2023—Stripping Dr. Patil of his titles and cutting his salary.**

121.   On March 20, 2023, shortly after the original Complaint was filed, Dr. Patil met with Dr. Aditya Pandey, the new Chair who replaced Dr. Muraszko.

122.   In that meeting, Dr. Patil was informed that his salary was going to be reduced by 40% and that he would be stripped of all his clinical roles, administrative positions, and clinical research positions. Dr. Patil was also informed that significant space assigned to him to do research would be taken away.

123.   Dr. Patil protested and objected to all these measures.

124.   On March 23, 2023, just three days after that meeting, Dr. Patil received a letter from Dr. Pandey confirming and finalizing that his salary was cut by forty percent of what he was originally earning, that he would be fired from all administrative and leadership roles, that he would be removed from his various committees, and that he would no longer be allowed to continue serving in any of his longstanding clinically relevant functions at Michigan Medicine.

125.   On April 6, 2023, Dr. Patil received a letter informing him that his 11-year tenure as an IRBMED member was concluded, and Dr. Patil was also informed that he will not be reappointed. This impairs him from conducting cutting-edge clinical and translational research as well.

26

126.   Even after this Complaint was filed, and as each day passes, Michigan Medicine continues to inflict serious financial, emotional, and reputational damage to Dr. Patil and his family that is impossible to quantify.

## D. Beyond unfair treatment, Dr. Patil experienced multiple forms of discrimination and retaliation, leading to a hostile work environment.

### 1. Discrimination Based on Hearing Disability

127.   Dr. Patil has experienced severe and pervasive discrimination at U of M because of a hearing disability, a series of events that in aggregate constitute a hostile work environment.

128.   Dr. Patil suffers from a hereditary and progressive hearing disability, which has been symptomatic since the mid 2000's. He received a formal diagnosis and hearing aids in November 2012.

129.   Among other disabling components, hearing loss makes it difficult for Dr. Patil to recognize audio alerts, to communicate in noisy environments, to regulate speech volume, and to follow conversation in meeting environments when multiple individuals are speaking simultaneously.

130.   To his knowledge, Dr. Patil the only neurosurgeon at U of M with a hearing disability.

131.   Dr. Patil first raised the possibility of a hearing disability with the Chair of Neurosurgery, his supervisor Defendant Muraszko, in early 2010, when seeking help with communication challenges (missing pager alerts, needing lowered noise when rounding with residents in the intensive care unit, voice volume regulation), which caused him concern.

132.   Defendant Muraszko disregarded Dr. Patil's hearing disability and instead recommended voluntary participation in a program (Physicians Universal Leadership Skills Education, PULSE) to improve communication behaviors.

133.   Dr. Patil's fully voluntary participation in PULSE was later used in retaliation against him when it was misrepresented as a non-voluntary behavioral remediation.

134.   Defendant Muraszko did not, at that time or at any time in the future, ever offer help to solve hearing challenges, ever ask if Dr. Patil needed reasonable accommodation, or ever initiate any interactive process to accommodate his hearing disability.

135.   When Dr. Patil's hearing loss progressed to the point of needing hearing aids in November 2012, he again verbally informed Defendant Muraszko and requested reasonable accommodation and understanding.

136.   Hence, for a decade, Defendant Muraszko was well informed of Dr. Patil's hearing disability but showed no appreciation or accommodation of it.

137.   To foster greater awareness, Dr. Patil was very open about his hearing disability and the need for accommodation.

138.   For example, in an email message to Defendant Muraszko on November 14, 2018, Dr. Patil wrote:

> "I'm sorry that we couldn't have our meeting this morning. I'm not sure I heard you correctly (as you know, I am hard of hearing and wear hearing aids) but I thought you said you had texted me about your need to cancel. I want to make sure you have my correct number because I didn't receive a text or email. My cell is (734) . . . ."

139.   Opposite to reasonable accommodation, Defendant Muraszko has made offensive and condescending remarks regarding Dr. Patil's hearing disability, stereotyping him as a poor communicator.

140.   As a striking example, following a Morbidity and Mortality Conference on February 7, 2019, at which Dr. Patil was publicly humiliated and verbally abused by a Chair-appointed leader in the Neurosurgery Department, the Chief of Service, Defendant Sullivan, the Chair, Defendant Muraszko, said that she "understood" the Defendant Sullivan's unprofessional outburst on the grounds that Dr. Patil "did not get it" referring to Dr. Patil's inability to synthesize and to understand multiple simultaneous conversations and whisperings in a crowded conference room.

29

141. Defendant Muraszko, Defendant Sullivan and others in the administration have consistently and systematically refused reasonable accommodation for Dr. Patil's hearing disability, instead applying false conclusions and unfair and derogatory attributions of irresponsibility and unprofessionalism to him.

142. At the meeting on April 11, 2019 with the Defendant Muraszko, Defendant Lozon, and the Medical Staff Quality Administrative Manager, Maureen Naszradi to discuss the February 7, 2019 incident, Dr. Patil also requested that the discussion in the Morbidity and Mortality Conference be moderated to make the discussion clearer, more structured, and more understandable to him.

143. Despite providing published evidence to support a best practice of moderated Morbidity and Mortality Conference discussions, no accommodation was adopted.

144. The extent of Defendant Muraszko's indifference to the challenges of Dr. Patil's hearing disability are striking. For example, on August 29, 2019, while Dr. Patil presented a Grand Rounds lecture to the Department of Neurosurgery, Defendant Muraszko verbally interrupted his presentation seventeen (17) times in thirty (30) minutes, often talking over him.

30

145.   Reasonable individuals recognize that most, or possibly all, of a hearing disabled individual's adverse communication with colleagues potentially involves misunderstanding related to poor hearing, either alone or in the combination of what was said and subsequent reactions.

146.   By contrast, Defendant Muraszko, Defendant Lozon, and University Administration have responded to Dr. Patil's requests for accommodation and understanding of his hearing disability with accusations that Dr. Patil is making excuses. They have subsequently taken multiple unfair and retaliatory adverse employment actions against Dr. Patil on claims of poor communication, with reckless indifference and disregard for his hearing disability.

147.   The resulting harassment continues to the present time, resulting in adverse employment decisions, including the Defendant Muraszko's recommendation of non-renewal of Dr. Patil's hospital privileges.

## 2. Discrimination Based on Sex

148.   Dr. Patil has experienced discrimination based on his sex, male, because of disparate treatment by the Chair (Defendant Muraszko), Chief of Staff (Defendant Lozon), and University Administration in the terms and conditions of his employment compared to female colleagues.

31

Case 2:23-cv-10631-MAG-DRG   ECF No. 20, PageID.976   Filed 07/21/23   Page 33 of 185

149.   On rare occasions when professional disagreements have arisen between Dr. Patil and a female colleague, Defendants Muraszko and Lozon, both of whom are female, have repeatedly accused Dr. Patil of unprofessionalism and initiated a disciplinary action without notifying him or seeking his account of events.

150.   For example, in a letter dated April 12, 2018, the Chief of Staff (Defendant Lozon) and the female Senior Associate Dean for Faculty and Faculty Development Margaret Gyetko went so far as to ***falsely declare*** that "your [Dr. Patil's] account of an incident in the MRI OR differs from several others" despite never previously or subsequently seeking Dr. Patil's account of the incident.

151.   A clear double standard, based on sex, has been applied. While the Defendant Lozon required Dr. Patil to submit to evaluation by an Office of Clinical Affairs (OCA) psychiatrist for alleged unprofessional interactions with a female colleague, and the onus was placed on Dr. Patil to resolve any conflict with his female colleague, the same female colleague was permitted to refuse to meet with Dr. Patil to resolve any remaining misunderstanding, even in a moderated conversation with a University official.

152.   This double standard and gender-based motivation of Defendant Muraszko's treatment of Dr. Patil was acknowledged by the Department administration. On April 12, 2018, Defendant Sullivan apologized to Dr. Patil that

32

he and Defendant Muraszko "went behind your back" in their investigation and responded to Dr. Patil's query why with the causal connection between Dr. Patil's gender and his unfair treatment, "Karin [Defendant Muraszko] was just mad," he said, and noted that Defendant Muraszko had pointed out that the incident occurred on International Women's Day (March 8, 2018).  At the same meeting, Defendant Sullivan deterred Dr. Patil from seeking legal recourse, stating that "For people who have lawyered up, it has not gone well for them."

153.   Defendant Muraszko later admitted to encouraging a male anesthesiologist to file the complaint, which was false, against Dr. Patil regarding his interactions with the female colleague in the MRI OR.

154.   Furthermore, despite Dr. Patil's full and complete cooperation, and the false premises underlying the OCA disciplinary action, the injustice of this discriminatory incident was later compounded and used against Dr. Patil in an adverse employment decision.

155.   Dr. Patil reported discrimination based on sex on multiple occasions: to Associate Director David Betts in the Office of Institutional Equity (OIE) on February 11, 2019, to Executive Vice Dean Bradford on February 22, 2019, and to the Defendant Lozon in the Office of Clinical Affairs on May 2, 2019. To Dr. Patil's knowledge, there was no follow-up, and no action was taken.

33

156.   In addition, Dr. Patil appropriately reported his legitimate concerns about the Neurosurgery Chair (Defendant Muraszko) to the Chief of Staff (Defendant Lozon), including misuses of authority, coercion, bullying, threats, and retaliation against himself and others. Dr. Patil contrasted the behavior of Defendant Muraszko to that of Dr. Hoff, the previous and universally esteemed Chair of Neurosurgery. Defendant Lozon not only did not inquire further into the concern but also dismissed the comparison with *ad hominem*, rhetorically asking if Dr. Patil didn't think the previous Chair, who was male, "was a little sexist."

157.   Dr. Patil's experience is part of a pattern or practice of discrimination based on sex at Defendant U of M, particularly within the OCA, directed by Defendant Lozon. In currently ongoing professionalism investigations against Dr. Patil and other surgeons, to the best of Dr. Patil's knowledge, all the targets of OCA investigations are male. In each case, OCA applies discriminatory male gender-based stereotypes to these individuals without evidence or unbiased investigation.

158.   Remarks by the Chair of Neurosurgery, Defendant Muraszko, capture the pervasive extent of discrimination based on race and sex at U of M. On December 14, 2017, when Dr. Patil requested an equity evaluation of his demonstrably low compensation, Defendant Muraszko replied, ***"You are the wrong race and the wrong sex to have equity in compensation."***

34

### 3. Retaliation and Hostile Work Environment

159.   As described above, discrimination toward Dr. Patil based on hearing disability and sex have been severe and pervasive. Reporting discrimination has invariably been followed by administrative inaction, loss of confidentiality, and retaliation, leading to a hostile work environment.

160.   From 2010 to 2019, also as detailed above, Dr. Patil appropriately and repeatedly met with University leadership to raise concerns regarding issues of transparency, accountability, and discrimination in the Department of Neurosurgery.

161.   The hostile response to these efforts culminated when Dr. Patil was the target of public and degrading unprofessional conduct by Defendant Sullivan during the Neurosurgery Morbidity and Mortality (M&M) conference on February 7, 2019.

162.   During this public incident, Defendant Muraszko, rather than addressing Defendant Sullivan's violation of U of M Policy, remained completely silent.

163.   This was not the first time that Dr. Patil experienced a verbally abusive, uncontrolled, and unprofessional outburst from Defendant Sullivan.

164.   Dr. Patil previously informed Defendant Muraszko on January 9, 2019, of an almost identical outburst that occurred on December 14, 2018, and asked Defendant Muraszko to take action to support professional conduct.

165.    Instead of taking such action, following the M&M incident, Defendant Muraszko said that she "*understood*" and condoned the way Defendant Sullivan publicly humiliated Dr. Patil, which is contrary to U of M's stated Policies.

166.    The bullying of Dr. Patil by the Defendant Sullivan had a clear foundation—Defendant Muraszko had *falsely* written to Defendant Sullivan that she had "no idea" about permission she gave to Dr. Patil on December 14, 2017, to expand his operative days.

167.    This dishonest action by the Defendant Muraszko critically undermined Dr. Patil's credibility and reputation with Defendant Sullivan.

168.    Defendant Muraszko used her power as Neurosurgery Chair to undermine the standing and reputation of Dr. Patil, a tenured faculty member who had dared to be critical of her actions.

169.    At the same time, the response of Defendant U of M and its Administration shares responsibility for allowing and facilitating such retaliatory actions with nefarious intent. Dr. Patil's well-evidenced and courageously voiced concerns, when directed against a longstanding as well as politically and financially powerful Chair, Defendant Muraszko, fell on deaf ears in the U of M Administration.

170.    The response of the Office of Clinical Affairs, directed by Defendant Lozon, which is tasked with ensuring professional behavior, further encouraged and

36

expanded Defendant Muraszko's retaliatory behavior—the response of the Medical Staff Quality Administrative Manager at the April 11, 2019 meeting, when faced with an **_unprecedented_** senior faculty report of unprofessional behavior and hostile work environment, not only failed to follow U of M policies, but responded that **_"she wished that [Dr. Patil] had not said it created a 'hostile work environment.'"_** The OCA Administrative Manager suggested that Dr. Patil report such behavior in the future with a phone call.

171.   As a pattern or practice, the U of M Administration, rather than seeking and fixing problems, sought to avoid any kind of "paper trail." This was not only true of OCA, but also true at the Department level. For example, on April 13, 2018, Defendant Muraszko stated, in response to Dr. Patil's written correspondence to discuss an issue, "I don't do email or text."

172.   Concurrent with and after Dr. Patil raised these concerns, a series of orchestrated evens occurred in an apparent effort to discredit Dr. Patil. Three years of investigations were initiated and placed in the hands of exactly the same individuals about whom Dr. Patil had raised concerns.

173.   Dr. Patil been falsely accused and stripped of his ability to do his clinical work. Colleagues have shared that, seeing how Dr. Patil was targeted, they would never open their mouths to report wrongdoing.

174.   Dr. Patil believes that the reasons for the retaliatory actions of the Defendants against him are captured well in the EEOC publication, *Retaliation-Making it Personal*: "Authoritarian personalities, people who place a high value on status in group settings, are predisposed to retaliation when offended, particularly if that offense is from someone of a 'subordinate' status."

175.   This EEOC statement precisely describes Dr. Patil's experience with these Defendants at the University of Michigan.

176.   The retaliation experienced by Dr. Patil has had a chilling effect upon the willingness of individuals to speak out against mistreatment and discrimination. Colleagues have shared that, seeing what Dr. Patil has experienced, they will think twice before raising any concerns.

## E. Dr. Patil consistently followed institutional policies and the organizational chain-of-command to report concerns.

177.   Dr. Patil has consistently sought to resolve concerns through direct communication with individuals within the Department before escalating the issues.

178.   The meeting with Dean Woolliscroft in January 2010 responded to a personal invitation from the Dean for confidential evaluation of Defendant Muraszko.

38

179.   Previous and subsequent years of direct communication with Defendant Muraszko failed to produce any stable, written agreement to address legitimate and documented concerns.

180.   The meeting with EVDAA Bradford in February 2019 responded to earlier recommendations of Associate Vice Provost Sascha Matish (Academic Human Resources), Vice Provost Lori Pierce (Academic and Faculty Affairs), U of M's Ombuds, and occurred pursuant to U of M's stated Policies.

**F. Defendants responded inappropriately to Dr. Patil's concerns.**

**1. Failure of Defendant Lozon to Protect Against Retaliation**

181.   In compliance with U of M policies, Dr. Patil reported alleged unprofessional behavior by Defendant Sullivan and Defendant Muraszko in good faith to Defendant Lozon and the Office of Clinical Affairs (OCA) on February 7, 2019.

182.   In the report, Dr. Patil specifically shared his fears of retaliation, "Given their positions in the Department [Chair/Chief of Service] and the lack of support that I experienced during and after the event, ***I am fearful of retaliation and ongoing bullying.***" Dr. Patil's fears proved to be well-founded.

183.   Policy 04-06-047 calls for such reporting individuals to be supported and protected against any retribution or opportunity for retribution.

184.   In violation of its own policy, Defendants Lozon and U of M conducted no follow-up with Dr. Patil to investigate the incident report or to address the voiced concern of retaliation.

185.   Quite the contrary, rather than discussing the matter with Dr. Patil privately, in safety and in confidence, Defendant Lozon insisted upon a meeting together with Defendant Muraszko and dismissed Dr. Patil's concerns of retaliation.

186.   Dr. Patil, following Defendant U of M's Policy, informed Executive Vice Dean for Academic Affairs (EVDAA) Carol Bradford, Supervisor to Defendant Muraszko, of the Incident Report.

### 2. Use of OCA as a Weapon of Retaliation

187.   Dr. Patil recognized that an area of significant concern was the way administrative practices in the Department of Neurosurgery and of Defendant Muraszko transformed the Office of Clinical Affairs into a weapon of retaliation.

188.   Dr. Patil therefore scheduled a meeting with Defendant Lozon, on May 2, 2019, to share concerns openly and candidly with documented Departmental Concerns and Recommended Changes.

189.  Dr. Patil formally summarized his Departmental Concerns:

   a.  The University's Professional Standards of trust, openness, civility, and respect have not been maintained.

   b.  Ethical imperatives of equity, accountability, transparency, and professionalism likewise are sorely lacking.

   c.  Misuses of authority including bullying, threats, and retaliation are feared and have occurred. The Office of Clinical Affairs (OCA) has not fulfilled its obligation to objectively evaluate this Department.

   d.  The morale of Colleagues has appreciably declined and Star performers have either left the Department or left Michigan Medicine altogether.

190.  Dr. Patil additionally offered five recommended changes to reduce the risk of administrative retaliation through OCA actions:

   a.  Enforce impeccable standards of transparency and accountability. OCA communication should be clear and in writing, soliciting, and respecting candid dialogue and discussion.

   b.  Ensure that all parties are fully heard before findings are evaluated.

   c.  Ensure that all Colleagues who bring forward a concern to OCA are not subject to retaliation.

41

d.  Inform all parties, in advance of an OCA meeting, that they have an opportunity to invite an ombudsman or other medical staff advocate in a support capacity.

e.  Welcome individuals to periodically review their (appropriately redacted) OCA records to encourage understanding, engagement, personal and professional growth.

191.  Despite provision of documentary evidence, none of these recommendations were or have been subsequently adopted into practice. On the contrary, the treatment of Dr. Patil by Defendants Lozon and the OCA has been precisely the opposite, misusing OCA authority as a weapon of retaliation.

## G. Defendants launched a retaliatory and discriminatory investigative process against Dr. Patil.

### 1. Criticism and Counter-Attack

192.  Following the February 22, 2019 meeting between Dr. Patil and EVDAA Bradford, Dr. Patil, who is known for trying to resolve disputes, contacted EVDAA Bradford and Defendant Muraszko to schedule a formal meeting to address his concerns within the Department of Neurosurgery.

42

193.   At a meeting on June 5, 2019 with Defendant Muraszko, Dr. Patil was unfairly, and in violation of U of M Policy, criticized by Defendant Muraszko for "***taking things into your own hands***," referring to his meeting with EVDAA Bradford.

194.   Tellingly, ***the very same day***, Defendant Sullivan met with the Office of Clinical Affairs to discuss Defendant Sullivan's ***newly created*** concerns about Dr. Patil's alleged "behavior."

195.   Dr. Patil was subsequently informed by others that Defendant Sullivan raised these concerns about Dr. Patil with the Office of Clinical Affairs ***in retaliation for his incident report***.

196.   On June 14, 2019, EVDAA Bradford suggested a follow-up meeting to discuss the concerns that Dr. Patil had raised, to include Dr. Patil, Defendant Muraszko, Associate Vice Provost Sascha Matish of Academic Human Resources, and herself. After considerable delay, the meeting was scheduled for September 12, 2019.

197.   Dr. Patil expected to present and to discuss, openly and candidly, his concerns regarding protected research time, salary, and other administrative issues with Defendant Muraszko and EVDAA Bradford. Dr. Patil was hopeful that his concerns would be finally addressed. These hopes were short-lived.

43

198.   As a harbinger of Defendant actions to come, the September 12, 2019 meeting did not respect its stated purpose. Rather than receiving the planned opportunity to present his concerns, Dr. Patil's complaints were subjected to indifference, and then shockingly, and with no legitimate basis or warning, Defendant Muraszko issued Dr. Patil a vague and unfounded Performance Improvement Plan (PIP).

## 2. A Secret Medical Staff Quality Committee Review & Directive

199.   Following the September 12th meeting, Dr. Patil was further misled by Defendant Muraszko. In a September 13th email, Defendant Muraszko invited Dr. Patil to present follow-up materials and remaining concerns at a subsequent meeting, which was scheduled on September 20, 2019.

200.   However, at the September 20th meeting, instead of allowing Dr. Patil to share his concerns, Defendant Muraszko and Defendant Sullivan revealed that there would be an "inquiry," organized by them, of his practice.

201.   Defendant Muraszko informed Dr. Patil, for the very first time in seventeen (17) years, that there were unexplained and undescribed "concerns" about his practice requiring a formal Focused Professional Performance Evaluation (FPPE).

44

202.   Knowing his practice, his patients, and his record of clinical excellence, Dr Patil was suspicious, but cooperated fully with Defendants Muraszko and Sullivan.

203.   Unbeknownst to Dr. Patil, the retaliatory actions of Defendant Sullivan and Defendant Muraszko had prompted a Review by the Medical Staff Quality Committee (MSQC).

204.   Also unbeknownst to Dr. Patil, an MSQC Directive Memo from Defendant Lozon had been sent to Defendants Muraszko and Sullivan months before.

   a.   The Memo was sent to Defendants Muraszko and Sullivan on July 17, 2019.

   b.   However, the Decision was apparently made at a June 11, 2019 MSQC meeting.

   c.   The June 11, 2019 meeting was held shortly after the June 5, 2019 meeting at OCA between Defendants Lozon and Sullivan.

205.   To date, Dr. Patil has never spoken to or received a single question from the MSQC.

206.   The MSQC Directive for Special Professional Review, dated July 17, 2019, was hidden from Dr. Patil until May 2021, two years later.

45

207.   The MSQC Memo states that unspecified "concerns", so called "credible care-team member accounts", unfavorable external reviews, and a preliminary MVD (microvascular decompression) case analysis prompted Defendant Lozon to forward the "concerns" to MSQC.

208.   The so-called "credible care-team accounts", supposedly unfavorable external reviews, and alleged preliminary MVD analysis were maliciously acted upon but never revealed.

209.   Furthermore, although Defendants Muraszko and Sullivan received the MSQC Directive on July 17, 2019, Dr. Patil was not informed of the MSQC Directive or any concern regarding his practice until only four (4) days before Defendants Sullivan and Muraszko were asked to provide an update to MSQC on September 24, 2019.

210.   Furthermore, the MSQC Directive contains multiple and significant errors:

a.   A cited January 7, 2019 case was neither an MVD case nor was it classified as a *sentinel event*.

b.   The range of dates for examined MVD cases from 2001 to 2018 starts 5 years before Dr. Patil first joined the U of M faculty.

46

    c.  A prior review of MVD cases done by Defendant Muraszko (the only review of which Dr. Patil is aware) found similar rates of complications between Dr. Patil and other colleagues.

    d.  Findings regarding a November 22, 2016, laminectomy case, allegedly for which members of the Clinical Care Review Committee found the care to be "unreasonable," was disturbingly decided without any input from Dr. Patil. This is neither customary practice nor reasonable.

211.  It is striking that concerns regarding cases from years earlier were first raised in mid-2019, only after Dr. Patil voiced his concerns regarding Defendants Muraszko and Sullivan with U of M Administration. This is clear retaliation by Defendants.

212.  Again, Dr. Patil has been specifically told by others that Defendant Sullivan raised concerns about his practice "in retaliation" for the incident reported by Dr. Patil on February 7, 2019.

213.  The flawed management of these practice concerns also serves to underscore the administrative shortcomings and problems of transparency that characterize the Department of Neurosurgery and, unfortunately, the Office of Clinical Affairs, as reported repeatedly by Dr. Patil.

214.   Hence, what Dr. Patil believed would be the long-awaited opportunity (dating from 2017) on September 20, 2019 to discuss and to resolve the problems in the Department of Neurosurgery, turned into Dr. Patil being informed that there would be a Department Investigation of his practice, prompted by a secret memo from Defendant Lozon to Defendants Muraszko and Sullivan, seemingly prompted by an earlier meeting between Defendants Lozon and Sullivan.

## H. Dr. Patil was subjected to an improperly conducted Departmental Investigation.

215.   From September 2019 to February 2023, Dr. Patil was subjected to more than three years of protracted investigation, including the secret MSQC Inquiry and Directive, a so-called Focused Professional Practice Evaluation (Departmental Investigation), a flawed Institutional Investigation, a so-called Fair Hearing, and a perfunctory Appellate Review.

216.   The Defendants promulgate policies that, on the surface, seem fair and reasonable, and intended to protect employees from discriminatory or unfair actions by the Defendant organization.

48

217.   However, the actual practices of Defendant U of M are to routinely ignore its own policies and engage in actions that are improper and violative of the policies that are meant to protect employees like Dr. Patil.

218.   Instead of treating Dr. Patil in a fair and nondiscriminatory fashion, Defendants have engaged in deceit, dishonesty, harassment, and ostracism, while hiding behind a smokescreen of denial, counteraccusation, and unfounded retaliatory investigation.

219.   The MSQC Directive was issued on July 17, 2019, five months after Dr. Patil reported the unprofessional behavior of Defendant Sullivan and Defendant Muraszko, five months after Dr. Patil shared his Departmental concerns with EVDAA Bradford, and two months after Dr. Patil raised Departmental and OCA concerns with Defendant Lozon.

220.   The MSQC Directive calls for a departmental review to be conducted in accordance with UMHS Professional Practice Evaluation Policy 04-06-052.

221.   The subsequent Departmental Investigation was conducted by a four-person Committee formed by Defendant Muraszko and Defendant Sullivan, and the Committee reported findings to the same Defendants.

222.   Dr. Patil was provided with a copy of Policy 04-06-052 "Professional Practice Evaluation" by Defendant Muraszko and Defendant Sullivan on September

49

20, 2019, who said that the investigation would follow this policy and that he was welcome to ask questions.

223.   Review of the policy prompted many questions that Dr. Patil posed to Defendants Sullivan, Muraszko, and U of M; however, Dr. Patil never received a single answer from any Administration or Committee Members.

224.   After multiple attempts to get any type of answer (which he didn't), Dr. Patil was unfairly and improperly prejudiced.

225.   For example, Policy 04-06-052 states that monitoring, which includes medical record review, must be "specifically relevant to the privilege(s) granted or practice concern." The policy states that "the period of focused review that is time-limited, ***not to*** ***exceed 8 months***. [emphasis added]"

226.   The rationale for this eight (8)-month time limit in the Policy is very important; it is inequitable to ask a surgeon, who operated on many patients, to remember details of care provided years earlier.

227.   However, the Department Committee did not properly follow U of M's Policy. Instead of a specifically relevant and *focused review*, the Department Committee discriminatorily reviewed all (222) of Dr. Patil's operative cases for one entire academic year, and all (33) procedures for five (5) years for microvascular decompression. This was unprecedented according to OCA itself.

228.   Beyond the failure to follow the guiding Policy, no process to ensure the required objectivity of Departmental Committee members is apparent.

229.   The process to select the members of the Departmental Committee, the sources of recommendations for membership, and the steps taken to ensure their objectivity were never described, if any existed.

230.   Authority to form the Committee and to conduct the Investigation was improperly invested by Defendant Lozon in the same individuals, Defendant Muraszko and Defendant Sullivan, who were previously reported by Dr. Patil for unprofessional behavior.

231.   Defendant Sullivan was charged with ensuring that there were no "conflicts of interest". Yet it was the same Defendant Sullivan who verbally abused and publicly humiliated Dr. Patil less than a year earlier.  His conflict of interest was obvious and inexcusable.

232.   Between September 20, 2019, and December 19, 2019, Dr. Patil received no information whatsoever regarding the status of the Departmental Investigation or its findings.

233.   The MSQC Directive calls for the committee to plan "an interview of the physician who is the subject of the inquiry." However, for the entirety of the

51

Departmental Investigation, not a single question was asked of Dr. Patil, and not even one question Dr. Patil posed was ever answered by Defendant U of M.

234.   Defendants   deliberately   violated   the   MSQC   Directive—the Departmental Committee formed in response to the MSQC Directive failed to ever meet with Dr. Patil, though specifically instructed to do so in the Directive.

235.   U of M Policies call for investigative processes that are confidential, objective, equitable, unbiased, consistent, efficient, and evidence based. Measures are to be clearly defined and consistently implemented.

236.   On surface that would be reasonable, but in practice are not. The unfounded and overly broad Departmental Investigation appears to have been merely a smoke screen to try to find something that could be used against Dr. Patil.

## I. Defendants cruelly and improperly suspended Dr. Patil's clinical practice, in violation of U of M policies.

### 1. Unjustified Precautionary Suspension of Dr. Patil's Practice

237.   On December 19, 2019, Dr. Patil received a telephone call from Defendant Muraszko instructing him to page Defendant Lozon. Dr. Patil immediately complied.

238.    Defendant Lozon stated that the result of the Departmental Investigation was a recommendation that Dr. Patil be placed on a "clinical pause," effective immediately, and that patients would be told that he was "indisposed."

239.    Defendant Lozon admitted to Dr. Patil the striking and uncharacteristic nature of the Departmental Investigation of his practice: ***"I have been doing this for over 3 years and this is the most involved that I have seen. They usually look at 5 or 10 cases. I mean they reviewed every one of your cases for the last year and selected some over the past 5 years."***

240.    This is an admission of discrimination against Dr. Patil. It shows this was hardly the characteristics of a "focused" and objective review, and a clear violation of U of M Policies and Practices.

241.    When Dr. Patil asked to know the specific concerns, Defendant Lozon stated that she had asked Defendant Muraszko and Defendant Sullivan "to prepare an executive summary for you and for us," and described the investigation report as "very, very long. Like over a hundred pages."

242.    Dr. Patil expressed that his highest concern was the well-being of his patients, some of whom had been waiting a year for surgery. Defendant Lozon responded that "We need to protect the patients, and this is also for your protection too."

53

243.   The following day, December 20, 2019, Defendant Muraszko sent the summary promised by Defendant Lozon to Dr. Patil. Shockingly, it comprised only five bullet points, without specifics, on less than a quarter page. There was no detail provided to Dr. Patil to allow a fair opportunity to respond.

244.   Despite multiple follow-up requests for information, and in violation of U of M policies, almost all additional details were maliciously hidden from Dr. Patil until so-called Fair Hearing exhibits were exchanged in May 2021, two and a half years later. Many details were never shared.

245.   On December 23, 2019, Dr. Patil received a letter dated December 20, 2019 from Defendant Lozon, describing a "Precautionary Suspension" imposed on his practice by herself and Defendant Muraszko.

246.   This patently unfair and unfounded letter cites the Bylaws and U of M Policy 04-06-052. However, in violation of the Bylaws, Dr. Patil never received the required "reason(s) for the precautionary suspension, including the names and medical record numbers of the patient(s) involved (if any)" within three (3) days.

247.   Disturbingly, Dr. Patil has never received the reasons for the suspension or the medical record numbers of the involved patients.

248.   Defendant U of M refused to provide Dr. Patil with this necessary information until Dr. Patil demanded and received a so-called Fair Hearing.

249.   Dr. Patil was never informed that he could "suggest individuals for the Committee to interview" as stated in the in the MSQC Directive, due to the intentional lack of communication by the Committee.

250.   In fact, Dr. Patil received no communication whatsoever from the Committee from September 20, 2019 until the call from Defendant Lozon informing him of the suspension of his clinical practice.

251.   Hence, Dr. Patil was abruptly, and improperly, removed from his practice by Defendant Lozon and Defendant Muraszko, all without any clearly stated rationale or opportunity for a response, and all to the detriment of Dr. Patil's patients, programs, and colleagues.

## 2. Improper Continuation of the Suspension

252.   On January 6, 2020, Defendant Lozon wrote a letter to Dr. Patil regarding next steps in the process, including his continued suspension and further investigation by an *ad hoc* institutional committee.

253.   From this letter, Dr. Patil's understanding was that there was going to be an Institutional Committee that would review the concerns, that it would take up to 45 days, and that they would follow up with the findings.

55

254.    This letter however had no mention which procedures were problematic after this review, any medical record numbers, the Executive Summary, and any right to a Fair Hearing.

255.    In summary, it appears that after an ad hoc Departmental Investigation rife with procedural shortcomings, Defendant Lozon decided (without objective criteria or due process) ***to impose a broad and prolonged Precautionary Suspension and a second investigation on Dr. Patil, all without asking Dr. Patil a single question to explain or address any area of concern***.

256.    Dr. Patil, for no good or explained reason, has now been prohibited from practicing Neurosurgery for over 3 years.

257.    Prior to this surprise action in 2019, Dr. Patil had never been suspended from Clinical Practice, had never received any disciplinary action regarding his Clinical Practice, had never been put on Probation from a Clinical Practice and never been restricted in his practice in all the years that preceded this action.

258.    U of M Policy states that the "Assignment of a period of Focused Professional Practice Evaluation to assess current competence on one privilege does not affect the practitioner's existing privileges in good standing."

259.    However, in this case Dr. Patil's privileges were broadly revoked without stated grounds or clear definition of performance issues.

260.   The Bylaws do not allow for this continued suspension.

### 3. Improper Determination to Proceed to Routine Corrective Action

261.   The letter of January 6, 2020 states that its purpose was to update Dr. Patil "on the determination, on behalf of the Medical Staff, to proceed with routine corrective action."

   a.   This was a violation of due process in a Precautionary Suspension.

   b.   This was a violation of the expressed language of the Medical Staff Bylaws.

   c.   Specifically, Section 8.3 of the Bylaws only allows for very specific limited circumstances to allow for such actions that would include the extension of this suspension while such matters are being internally adjudicated. This includes: The Member's temporary or permanent mental or physical state is such that one or more patients under his/her care would be subject to imminent danger to their health as a result of his/her action or inaction if (s)he is permitted to continue exercise privileges; (b) There is substantial evidence that the Member has committed acts of an illegal or unethical nature while in the UMHHC or in another health care setting which are of such gravity that, if

57

proven, would justify revocation or permanent suspension of Medical

Staff Membership, privileges, professional licensure or prescribing

authority. None of these applied to Plaintiff, but Defendants extended

the suspension for years while the matter was being internally

adjudicated at Michigan Medicine.

d. Action is supposed to be taken within 14 days to avoid a reportable

event to State licensing bodies and the National Practitioner Data Bank.

(NPDB). All recommendations and actions are to be *held in abeyance*

until the matter is adjudicated per Section 8.2-7 of the Bylaws.

e. Nothing was held in abeyance. Dr. Patil was unable to practice, unable

to continue his research, and was even denied access to electronic

patient records during and after his so-called Fair Hearing.

## J. Dr. Patil was then subjected to a second and equally flawed Institutional Investigation.

262.   U of M Bylaws states that when the Executive Committee for Clinical

Affairs (ECCA) designates an *ad hoc* committee to investigate as part of routine

corrective action, "the investigator (person or committee) shall promptly investigate

the matter and generally within forty-five (45) business days after the receipt of the designation, forward a written report of the investigation to the ECCA."

263.   Dr. Patil endured the Institutional Investigation from December 20, 2019 to August 4, 2020, over one-hundred fifty (150) business days,

264.   The 150-business-day investigation violated Medical Staff Bylaw 8.2-4 that requires such an investigation to completed within 45 days.

265.   This is not merely a violation based on numbers. During this entire time, Dr. Patil was not practicing. He was not operating on patients nor was he seeing patients in clinic in a non-operative capacity.

266.   Throughout the lengthy investigation, there was no transparency by the Defendants. In fact, from the beginning, Defendants energetically and deliberately concealed information from Dr. Patil.

267.   In sharp contrast, confident of his practice, his patients, and his record of clinical excellence, Dr. Patil consistently urged individuals and investigative committees to "shine a light and reveal the truth." But that never happened.

268.   As a characteristic example, between September 2019 to August 2020 and beyond, Dr. Patil was essentially shut out. He was only provided a two-hour opportunity to speak to committee members. At that time, in June 2020, Dr. Patil used the precious opportunity to tell the Institutional Committee: "The Truth is not

pretty, but exposing the unvarnished Truth is the most certain path to positive change."

269.   At the same time, it comes as no surprise that flawed investigations, conducted without candor and transparency, arrive at inaccurate conclusions. Process failures have led to groundless findings, while inflicting immeasurable harm to patients, colleagues, the Institution, and Dr. Patil.

### 1. Biased Members of the Institutional Committee

270.   Importantly and tellingly, no information was provided to indicate how the members of the Institutional Committee were selected or how potential conflicts were considered and addressed.

271.   One biased Neurosurgeon on the Institutional Committee competes with Dr. Patil for microvascular decompression cases, operating room time, resident support, and disagrees with Dr. Patil's belief that Morbidity and Mortality conferences should be evidence-based and moderated.

272.   Another Neurosurgeon on the Institutional Committee had previously served on the Departmental Committee, demonstrating that the investigations were not independent.

273.   Bias on the part of these two Neurosurgeons would easily have influenced Institutional Committee deliberations.

274.   Disturbingly, a third Institutional Committee member provided leadership and supervision in a service where Dr. Patil has often uncovered procedural errors and has insisted that patients receive appropriate care. Dr. Patil would point out errors for patient safety to maintain the standard of care. Yet, this person was put on the Institutional Committee evaluating Dr. Patil.

275.   By failing to follow its own Policies, U of M failed to ensure the objectivity of both Departmental and Institutional Investigations.

## 2. Biased Assessments of the Institutional Committee

276.   A clear example of bias on the part of the Institutional Committee is that favorable findings by independent and knowledgeable Investigators were dismissed. This is another clear example of discrimination against Dr. Patil.

277.   Dr. Raymond Hutchinson, Associate Dean for Regulatory Affairs, conducted an extensive investigation and determined (and reported to Dr. Patil) that no significant concerns were present regarding his research protocols.

278.   As a further example of harassment, discrimination and retaliation against Dr. Patil, later in August, Defendant Lozon reported that the Institutional

61

Committee "had not been satisfied" and that a formal Inquiry had been requested of the IRB.

279.   This resulted in an immediate and complete suspension of Dr. Patil's and colleagues' longstanding Clinical Research Program in Deep Brain Stimulation.

280.   Not surprisingly, the formal IRB Inquiry found no areas of concern, just as Associate Dean Hutchison had reported.

## K. During the Institutional Investigation, Defendants deliberately humiliated and ostracized Dr. Patil.

### 1. Failure to Maintain Confidentiality

281.   Administrative best practices and U of M Policies, including preservation of confidentiality, were violated on multiple occasions.

282.   One of U of M's Policies states that all parties shall avoid speculation, premature conclusions, gossip, and any discussion of these matters with anyone not contemplated by the Policy.

283.   First, information regarding the Institutional Investigation was intentionally shared with a Resident by an attending Neurosurgeon, prompting a fear that working with Dr. Patil would "destroy his career".

284.   Second, an email sent to eighteen (18) Department members on the morning of December 24, 2019, less than 24 hours after Dr. Patil received the December 20th letter from Defendant Lozon, begins, "As you may have heard, Dr. Patil is currently on Administrative Leave."

285.   Third, an email sent by Defendant Muraszko on February 4, 2020, to three (3) Administrators regarding Dr. Patil's clinic reads, "I would move these patients as my last conversation with the Office of Clinical Affairs suggests Committee has not yet been formed."

286.   Defendant Muraszko's email was then forwarded by one of the Administrators to additional Neurosurgeons, and then forwarded further to Staff.

287.   When Dr. Patil brought the breaches of confidentiality to the attention of U of M, nothing was done to correct these serious discriminatory and retaliatory violations.

288.   Furthermore, U of M leadership regularly and publicly spread false information about Dr. Patil, stating that he was on "Medical Leave."

289.   Confidentiality has not been maintained, making Dr. Patil an outcast in his own Department.

## 2. Removal from Departmental Communications

290.    In addition, Defendant Muraszko deliberately and secretly removed Dr. Patil, without notification, from the group email list that is used to conduct most important Neurosurgery business.

291.   Dr. Patil first became aware of his name removal when he did not receive information about a faculty meeting.

292.   Notifying the Department administration prompted no corrective action.

293.   It was only after Dr. Patil protested over weeks that the deletion of his name was finally corrected. Defendant Muraszko admitted responsibility for the removal of his name.

294.    With these actions of which he is aware, and likely others that remained unknown to him, until discovery is taken, Dr. Patil has been effectively ostracized.

## L.      The Institutional Investigation reached false conclusions and made humiliating recommendations.

295.    On August 4, 2020, following the Institutional Investigation, the Office of Clinical Affairs issued a defective Letter of Findings and

Recommendations, containing evidence of errors and bias ultimately leading to false conclusions.

296. On August 13, 2020, Dr. Patil formally requested a Fair Hearing and reiterated the major questions that he had posed during the two investigations, none of which had been answered.

297. The Medical Staff Bylaws state that any recommendation or action taken by ECCA during Routine Corrective Action "will ordinarily be held in abeyance for a period of thirty (30) days or the timely and effective exercise of procedural rights applicable to the action, whichever is longer."

## M. Defendants pressured Dr. Patil to participate in a behavioral program that placed his health and privacy at risk, then threatened his clinical privileges.

298. Defendant Lozon also stated to Dr. Patil, without notice, that Defendant Muraszko had refused to endorse his Application Packet for Reappointment and that his Medical Staff Membership and privileges would be allowed to lapse as of October 8, 2020.

299. On September 30, 2020, Dr. Patil emailed Defendant Muraszko and raised his concerns about her lack of communication regarding her refusal to endorse his Reappointment Application.

300. To put this action in context, denial of Reappointment to the hospital staff is effectively a "kiss of death" for most physicians, especially those with procedural specialties, who must work out of a hospital in order to earn a living under their respective trade, which in Dr. Patil's case and required over a decade of postgraduate training.

301. Dr. Patil described how distraught he was, since he had received no explanation or any type of advance notice, despite that he and Defendant Muraszko communicated regularly.

302. Dr. Patil further expressed his disappointment since the refusal was not based on his medical competency or his ability to practice in his field.

303. Dr. Patil indicated to Defendant Muraszko that this action was causing serious harm to him, his impeccable reputation in the medical community, his patients, the programs he has been working on, and his colleagues at U of M.

## N. Defendants inaccurately and damagingly reported Dr. Patil to the National Practitioner Data Bank and the State Medical Board.

304. Additionally, and disturbingly, on September 30, 2020, Dr. Patil received a letter informing him that he was named in a Report submitted to the National Practitioner Data Bank (NPDB).

305.   This letter was submitted by U of M on September 22, 2020, and reports "suspension of clinical privileges" based upon "immediate threat to health or safety" and "substandard or inadequate care."  There was no reasonable basis whatsoever for U of M to send such a damning document.

306.   Again, as part of the pattern and practice of U of M's plan to humiliate and pressure Dr. Patil to accept their wrongful actions, Dr. Patil did not receive any advance notice or explanation from U of M that this letter to NPDB would be sent.

307.   Defendants report to the NPDB was not merely a matter of mandatory reporting, but rather a false, defamatory report that was malicious in both substance and its timing:

   a.   Defendants recently issued another report to the NPDB indicating that he "*allowed his clinical privileges to lapse while under investigation*" (Emphasis added).

   b.   This is a falsehood that can also be debunked by documentation and other evidence. It is a false statement filed in the National Practitioner Data Bank.

   c.   Another report was recently filed in 2023 that created a series of systematic errors that inflated concerns.

308.   Defendant U of M's report to the NPDB further harms Dr. Patil's heretofore impeccable reputation in the medical community in Michigan, the United States, and the World.

## O. Defendants manipulated Dr. Patil and misused U of M policies to hide the truth of the investigative process from him.

309.   From September 2019 and before, Defendant Muraszko, Defendant Sullivan, Defendant Lozon, and Defendant U of M repeatedly and wrongfully refused to respond to any of Dr. Patil's requests for clarification or answers to his questions.

310.   On August 13, 2020, Dr. Patil formally requested a Fair Hearing and reiterated the major questions that had arisen with respect to the Professional Practice Evaluation process, the Departmental Investigation, the Institutional Investigation, and the ECCA findings and recommendations of August 4, 2020.

311.   Defendant Lozon responded, "Your letter outlines an extremely long and detailed list of questions. We will endeavor to answer them but in my, admittedly, brief review of the letter, I do not see a request for a hearing."

312.   Instead of answers, Dr. Patil then received a letter from the Office of General Counsel (OGC) on August 20, 2020, which noted that the Fair Hearing Plan

(FHP) policy states that "there shall be no right to discovery" and that "neither party is entitled to receive answers to questions or provide information prior to the hearing except as otherwise specified in the FHP."

313.  In short, because Dr. Patil had now requested a Fair Hearing, he was no longer entitled to receive any answers to the questions that he had posed to Defendants for the past year.

314.  The OGC letter further advised, "if you wish to receive counsel and advice regarding the FHP and/or hearing process, we encourage you to engage legal counsel in this matter." The letter further indicated that Defendants had retained outside counsel to represent its interests during the hearing.

315.  Following this advice, Dr. Patil obtained representation by legal counsel and informed Defendants in a letter to Defendant Lozon on September 30, 2020. Defendant Lozon responded that future communication between OCA and Dr. Patil should occur through legal counsel.

316.  Hence, rather than engage in honest dialogue and dispel misunderstanding, Defendants advised Dr. Patil to seek representation by legal counsel, which he did. Then, solely on the basis that he had followed their advice, Defendants restricted Dr. Patil's communication with OCA.

**P. Defendants coerced Dr. Patil into signing an outrageous and humiliating Focused Professional Practice Evaluation (FPPE) Monitoring Plan.**

317.   On October 20, 2020, Dr. Patil was given a document by the Department of Neurosurgery that would govern his return to practice with conditions, as foreshadowed in the August letters from the Office of Clinical Affairs (OCA).

318.   The supervision outlined in the Focused Professional Practice Evaluation (FPPE) Monitoring Plan would require Dr. Patil, a world-renowned Neurosurgeon, to resume a trainee role and get approval for all clinical decisions from monitoring doctors.

319.   Distressingly, it also stated that "Dr. Patil will not resume MVD Procedures until completion of activities described below. Dr. Patil will enroll in and successfully complete the University of San Diego's PACE Program for clinical skills and competency evaluation. Dr. Patil will observe 10 MVDs at a mutually agreed-upon outside program before undertaking cases at Michigan Medicine." A requirement that could take up to two-thirds (2/3) of a year.

320.   To further embarrass Dr. Patil, the FPPE Plan further stated that "Once resuming MVD cases at Michigan Medicine, Dr. Patil will perform 10 MVD procedures together with surgeon mentor(s). Observation/mentoring will consist of

70

a co-surgeon mentor scrubbing into cases, followed by at-shoulder observation by the mentor at mentor's discretion. Mentorship will be shared by at least two surgeons who have significant expertise in the field." This step alone would likely take at least three (3) years to complete.

321.   Furthermore, his supervision would be done by one of Dr. Patil's colleagues, incidentally one who has a higher rate of MVD complications and/or issues than Dr. Patil.

322.    In a further effort to humiliate Dr. Patil, another recommendation was that Dr. Patil must perform five (5) craniotomy cases together with a surgeon mentor(s), even though there were never any alleged problems with Dr. Patil performing craniotomies. Furthermore, the mentor selected for this purpose was none other than Defendant Sullivan, who had a history of publicly humiliating Dr. Patil.

323.   Finally, for the performance of Deep Brain Stimulation procedures, for which Dr. Patil has internationally acknowledged expertise and for which no concerns were reported, the FPPE Plan called for him to perform 10 DBS procedures with a surgeon mentor *who had not performed a single DBS procedure in over a decade*.

324.   Collectively, the completion of all these tasks would take many years, and the FPPE does not place *any estimated dates of completion or target goals for dates of completion for any of the above-mentioned tasks.*

## Q. With Dr. Patil's practice and credentials held hostage, Defendants forced Dr. Patil to attend an in-person behavioral program evaluation.

### 1. Professional Renewal Center Program

325.   On October 15, 2020, Defendant Lozon emailed Dr. Patil regarding a decision made by the ECCA members in an Executive Session.

326.   Defendant Lozon indicated that she discussed with ECCA members Dr. Patil's request for a referral to a different "program for evaluation and remediation of professionalism issues, following your unsuccessful attempt to engage with the Acumen Institute"—ultimately dismissing Dr. Patil's concerns that this Acumen Institute is a referral program for people associated with substance abuse, sexual misconduct, and mandatory board actions—all things not related to Dr. Patil.

327.   The email stated that Dr. Patil would be given an opportunity to attend an alternate program—the Professional Renewal Center (PRC) in Lawrence, Kansas.

328.   Defendant Lozon stated that "this Program was recommended to the Office of Clinical Affairs for its expertise in assessment, treatment, and rehabilitation of high-accountability professionals. The Professional Renewal Center utilizes a biopsychosocial assessment approach, multi-modality treatment and longitudinal participation in professional improvement programs."

329.   Defendant Lozon stated that Dr. Patil's "eligibility to participate in the Professional Renewal Center's program would be determined during an interview with PRC Medical Director" since the process starts with an "evaluation phase and an identification of specifics of longitudinal intervention contingent on the outcome of the evaluations by several of the center's faculty members."

330.   In the same unfair manner that Dr. Patil previously was allowed only one day to get in touch with Acumen Institute, once again and unfairly, Dr. Patil was only allowed one day—by October 16, 2020—to schedule an interview with the PRC Director.

331.   Dr. Patil was also informed that he was in a "grace period" that might permit his continued clinical appointment, since his medical staff membership and privileges had lapsed on October 8, 2020.

332.   Defendant Lozon instructed Dr. Patil that "at a minimum, you would need to commit to: 1) attend the four-day assessment at Professional Renewal

Center, contingent on confirmation of your eligibility, and 2) sign the Focused Professional Practice Evaluation plan required for even a partial return to practice."

333.   Defendant Lozon further implied that it was Dr. Patil's sole responsibility to effectively coordinate this four (4)-day evaluation and to participate in the Professional Renewal Center Program, "including but not limited to executing all documentation required by the Center and complying with the Program requirements."

334.   Defendant Lozon also noted "that under the University of Michigan Hospitals and Health Centers (UMHHC) Medical Staff Bylaws, you are required, to "execute written releases and/or authorizations" upon the request of UMHHC in order to facilitate Professional Review Actions. Article XVI, 16.5."

335.   Dr. Patil was also told that "during the 30-day grace period, the final opportunity to consider a recommendation regarding your continued Medical Staff status is at the October 20, 2020 Credentialing Committee meeting. Contingent on a recommendation for reappointment, ECCA members would vote on your status at their October 27, 2020 meeting."

**2. Dr. Patil's Efforts to Maintain Communication with Defendants and PRC**

336.  On October 15, 2020, Dr. Patil was informed of the referral to Professional Renewal Center.

337.  On October 20, 2020, Dr. Patil received and signed the Focused Professional Practice Evaluation Plan.

338.  On October 23, 2020, Dr. Patil traveled to Kansas, despite COVID, to begin the Professional Renewal Center Program.

339.  On October 28, 2020, Dr. Patil successfully completed the Professional Renewal Center Program.

340.  From October 28, 2020, to December 7, 2020, Dr. Patil heard nothing from Professional Renewal Center regarding his time there.  Dr. Patil therefore contacted PRC staff to obtain a copy of their report.

341.  On December 9 and 10, 2020, Dr. Patil spoke to Professional Renewal Center Program staff, reviewed preliminary results, and requested a copy of the final report when ready.

342.  From December 10, 2020, to January 21, 2021, Dr. Patil received no follow up from Professional Renewal Center.

343.  On January 21, 2021, Dr. Patil spoke with Defendant Lozon and explained how others within the Office of Clinical Affairs seemed to think that Dr.

Patil had already received a copy of the Professional Renewal Center Findings and Recommendations even though Defendant Lozon knew the written Professional Renewal Center Report was not given to him.

344.   Dr. Patil insisted that he would like to see a copy of the written Professional Renewal Center Report, since he believed there was a significant disparity between the lack of objective findings that Professional Renewal Center shared with him and his experiences during his evaluation in Kansas.

345.   From January 21, 2021, to February 15, 2021, a series of emails and calls between Dr. Patil and Professional Renewal Center ensued with miscommunication and no actual follow through from Professional Renewal Center.

346.   On February 15, 2021, Dr. Patil wrote a letter to the Office of Clinical Affairs seeking a meeting to resolve any remaining issues and return to his Practice.

347.   Dr. Patil criticized the open-ended, preferably in person, three (3) week, seven (7) days per week, eight (8) hours per day "programming" experience that PRC allegedly recommended for him.

348.   The PRC recommendation was not based on any specific examples of concerns, and Dr. Patil was told that if he needed any specific answers, he should get them from Defendant U of M.

349.   At this point in time, Dr. Patil had been prevented from returning to his Practice for over two (2) years. There were no complaints from patients about Dr. Patil's standard of care, no patients who had come to harm in his practice, and no evidence of wrongdoing on his part.

350.   At the same time, every time that Dr. Patil attempted to return to his Practice, even after doing everything that is asked of him, the Office of Clinical Affairs and Defendant Lozon created additional obstacles that further pushed back his return.

### 3. Defendants refuse to meet with Dr. Patil

351.   On February 15, 2021, Dr. Patil requested a meeting with Defendant Lozon, Ms. Napiewocki from the Office of General Counsel (OGC), his attorney, and Defendants' outside counsel to come up with a solution.

352.   Dr. Patil's understanding was that such meetings had led to productive resolutions in the past.

353.   However, on February 23, 2021, Defendant Lozon declined that meeting to try and get Dr. Patil back to his Practice.

354.   On February 26, 2021, Dr. Patil sought understanding from OCA and clarified to Defendant Lozon that he was waiting for more information from the Professional Renewal Center.

355.   From February 26, 2021 to March 19, 2021, Dr. Patil heard nothing from either PRC or OCA.

356.   On March 19, 2021, Dr. Patil sent another email to Defendant Lozon inquiring why his February 26, 2021, email had been ignored.

357.   On March 22, 2021, Defendant Lozon replied to Dr. Patil that any directions he needed had already been provided and that next steps were "entirely up to you."

358.   The next day, Dr. Patil requested another meeting with the Office of Clinical Affairs and once again had no success.

359.   On March 24, 2021, the Office of Clinical Affairs sent an email declining any meeting: "I don't see that a meeting or oral discussion between us would be beneficial at this time." Defendant Lozon kept ignoring Dr. Patil, contrary to Defendant U of M Policies.

360.   Dr. Patil's March 25, 2021 letter to the Office of Clinical Affairs was Dr. Patil "imploring [OCA] to reconsider your decisions."

361. From March 25, 2021, to May 19, 2021, there was no follow up conducted by the Office of Clinical Affairs.

362. On May 19, 2021, Dr. Patil received a notice from the Michigan Department of Licensing and Regulatory Affairs (LARA), that authorized an Investigation against his Professional License.

## R. Without prior notification or justification, Defendants deny Dr. Patil's re-appointment to the Medical Staff.

363. On October 18, 2021, Defendant Lozon sent Dr. Patil a letter to describe the steps taken by the ECCA regarding his medical staff membership and privileges.

364. The letter stated that "in accord with the University of Michigan Hospitals ("UMH") Medical Staff Bylaws ("Bylaws" Section 5.3), the Credentialing Committee members on October 5, 2021, carefully reviewed information about your competence, qualifications and standing, including but not limited to your Chair's recommendation for non-reappointment, and voted to recommend that your reappointment application and request for clinical privileges be denied."

365. To put this in context, Dr. Patil would forever be forced to answer, in every hospital credentialing application which accompanies every application for employment, that his hospital privileges were not renewed, and this could (and based

on recent event, actually did) negatively impact his ability to secure a new position or practice anywhere in the country, even outside of Michigan and Michigan Medicine.

366.   The letter further indicated that after the ECCA "received the Credentialing Committee's recommendation, on October 12, 2021, ECCA considered your application and request for Clinical Privileges and recommended that the same be denied."

367.   They state that "the reasons include the concerns and issues that were fully addressed in previous letters (July 14, 2020, and August 4, 2020) and your failure to comply with the comprehensive retraining, assessment, evaluation and remediation plan specified therein."

368.   Dr Patil did not have the benefit of due process, and the findings of the Office of Clinical Affairs Investigation were never subject to validation or appropriate scrutiny, as required by Defendant U of M Policies.

369.   Dr. Patil has made repeated requests for documents and records that form the basis for the findings of the Office of Clinical Affairs. Defendant, U of M, despite their stated and written Policies requiring they produce such documents, have failed, and refused to produce even one shred of evidence to support their findings.

370.    Furthermore, even if a biased Credentialing Committee would believe the findings have any merit, there is no basis whatsoever for the refusal in terms of medical competency or ability for Dr. Patil to practice in his field.

371.    Dr. Patil's medical competency or ability have not only been unquestioned but praised throughout his career at U of M.  That is why the current actions of Defendant U of M are so reprehensible.

372.    Moreover, the concerns just recently raised involve only a tiny fraction of Dr. Patil's extensive Neurosurgical Practice.

373.    It is Dr. Patil's belief that the actions of Defendant Muraszko, Defendant Sullivan, Defendant Lozon and Defendant U of M are not only retaliatory, but part and parcel of a pattern of conspiracy against his return to practice at Defendant, U of M.

374.    In fact, before the Fair Hearing completed, Dr. Patil learned that Defendant Muraszko has already hired a replacement for Dr. Patil to take over his Deep Brain Stimulation practice.

375.    Departmental privileging policies were also re-written in a manner that would make it difficult for Dr. Patil to be credentialed even after being cleared of any wrongdoing.

376.   The administrative power of the credentialing process should not be, but was used, as a political weapon to retaliate against Dr. Patil.

377.   Dr. Patil raised legitimate concerns regarding administrative practices in the Department of Neurosurgery and the Office of Clinical Affairs.

378.   The outrageous actions against Dr. Patil reveal a personal vendetta against him by Defendant Muraszko and certain co-conspiring members of the Defendant U of M Administration: ***The individuals against whom the concerns were raised, namely the Defendant Muraszko, Defendant Sullivan, and Defendant Lozon are precisely the same individuals who governed the Department and Institutional Investigations, as well as the Recredentialing process.***

379.   While Defendant U of M Administration has claimed that the processes imposed upon Dr. Patil are the same for all medical staff, the actions taken against Dr. Patil in the absence of clear evidence or the opportunity for response, is unprecedented.

**S. Dr. Patil participated in the so-called Fair Hearing process as the only available alternative to address the flaws of the investigational and re-credentialing process.**

380. Dr. Patil has always welcomed scrutiny of his Practice with hopes of improving his Practice and of improving the care of his patients.

381. What Dr. Patil thought would be objective and rigorous investigations characterized by the kind of integrity that one would expect of Defendant U of M, turned into a mockery of his expertise and professionalism.

382. Dr. Patil was neither provided with the factual background, the required detail, nor the specific findings of multiple investigative processes directed against his character and practice. Rather than revealing or informative, the process was executed to be punitive.

383. Dr. Patil requested a so-called "Fair Hearing," because he wanted to know the truth of the investigative process and how such conclusions were reached about his Practice.

384. At the same time, Dr. Patil knew the truth, knew where his complications lay with respect to his colleagues, knew how he managed DBS infections, knew (as a member of the IRB) that he was following all the protocols for obtaining research consent, and knew that his relationships with individuals were excellent.

385. Dr. Patil knew his only option to discover *anything* about the investigative process and/or its findings was to ask for the so-called Fair Hearing.

Prior to this request, all the questions he had asked of the Department, and of the Office of Clinical Affairs to understand the process, were met with absolute silence and, in some cases, outright refusal.

386.   Dr. Patil always knew and was open to the truth and truly believed that a dispassionate review within a Fair Hearing would reveal the truth. Sadly, it has not.

387.   Even for the hearing, Dr. Patil and the hearing panel were denied access to critical information that would shed light on the superb quality of his practice, his exemplary professionalism and mentorship, and the genesis of the corrupt nature of the investigations sought to destroy his reputation.

388.   Dr. Patil maintained faith in Defendant U of M and his colleagues who served on the Hearing Panel.

389.   Despite his treatment by the Defendants, Dr. Patil loves his job, loves what he does at U of M, and does not want to leave—especially because of retaliatory behavior.

**T. The so-called Fair Hearing was structured as a rubber stamp process.**

390.   Defendant U of M has established a Policy and Practice for what is described as a "Fair Hearing Process".

84

391.   Despite the title, this process is anything but fair.

392.   Instead, it is a mockery of justice and is merely a cover for Defendant U of M's discrimination and retaliation against Dr. Patil. It is a rubber stamp for the Defendants.

393.   The entire Fair Hearing process experienced by Dr. Patil was biased and discriminatory from the outset, during the Hearing, and beyond its conclusion.

## 1. A Partisan Hearing Officer

394.   As a first example, the Hearing Officer who is meant to be impartial was not. He was unilaterally selected by Defendant U of M who then paid him to act on their behalf.

395.   This is unrebutted because the Hearing Officer that Defendant U of M unilaterally selected was one of their own outside counsels, who had represented U of M in the past.

396.   The bias was so evident and blatant that Dr. Patil's counsel had to request that the Hearing Officer be recused because of overt bias.

397.   For example, the Hearing Officer refused to allow key evidence in the Hearing, including, but not limited to: evidence of confidentiality violations,

nefarious motives, discrimination, and retaliatory actions—all of which he deemed to be *irrelevant*.

398.   The Hearing Officer acted in such an outrageous fashion during the Hearing that he, on his own, objected to questions of witnesses just as if he were the advocate for Defendant U of M.

399.   Dr. Patil contends that the Hearing Officer was in fact biased.

400.   In addition, Dr. Patil contends, based upon his information and belief, that the rendered Decision in his case was either completely written by, edited by, or drafted in some way by U of M ECCA counsel Hall Render.

401.   That is why we intend to call the Hall Render attorneys as witnesses in this case.

## 2. Restricted Fair Hearing Testimony

402.   After numerous delays of this so-called Fair Hearing, Dr. Patil finally received a chance to be heard.

403.   However, Dr. Patil was ***prevented*** from providing information he needed to fully present his case to the Hearing Panel.

404.   Dr. Patil was not allowed to discuss retaliation.

405.   Dr. Patil was not allowed to discuss discrimination.

86

406. Dr. Patil was not allowed to discuss improper motivations and malice.

407. Many of Dr. Patil's proposed witnesses and proposed exhibits were excluded from presentation at the Hearing.

408. All these matters were relevant and germane as to whether the decisions made by Defendants were arbitrary, capricious, and unreasonable.

409. The Hearing Panel (jurors) and the Hearing Officer (judge) were all selected by Defendant U of M and ECCA, and this includes Defendant Lozon.

410. None of the Hearing Panel members were from an outside institution.

411. It is also worth noting that the Fair Hearing Plan places the burden of proof solely on the "Member"—Dr. Patil in this case—and requires a burden of proof to be met by clear and convincing evidence, ***all without Discovery***.

412. Additionally, much of the evidence that was "allowed" by the Hearing Officer was only permitted under unreasonable restrictions, and in many cases, redactions proactively placed by the hand-picked Hearing Officer, who also has represented Defendant U of M in past legal matters, including in litigation.

413. These standard and persistent rulings of exclusion, some made proactively by the Hearing Officer without opposing counsel placing the objections themselves, made Dr. Patil's burden of proof insurmountable and predetermined the outcome.

414.   Essentially, the standard employed by Defendants and its team impermissibly stacked the deck against Dr. Patil, requiring the inaccurate OCA version of events to be presumed to be true.

415.   As such, the application of a less exacting standard for Dr. Patil's conduct to impact patient care prejudiced his rights to a fair hearing.

416.   This was noted by Dr. Patil's counsel throughout his Hearing, and a recusal was sought for the Hearing Officer.

417.   Briefs were exchanged and the Hearing was held. Unsurprisingly, the Motion for recusal was denied, and the Hearing Officer continued.

418.   The Hearing continued under these unfair conditions, which only worsened over time—the proceeding was a ***_kangaroo court_***.

**U. Despite all odds, Dr. Patil focused on the truth and met the burden of proof.**

419.   Despite these insurmountable obstacles, Dr. Patil met the required burden of proof by clear and convincing evidence, and proved that ECCA's actions and recommendations were arbitrary, capricious, and not based in fact.

420.   Dr. Patil presented hundreds of pages of exhibits that included, but were not limited to publications, e-mails, expert reports, expert witness testimony by a Neurosurgeon with an impeccable record and reputation, sworn Affidavits (all of

which should have been read thoroughly); in-person testimony, relevant Policies and Procedures, and more.

421.   The so-called Fair Hearing is the only mechanism within Defendant U of M that allows examination of the investigational process.

422.   If Dr. Patil had not requested the Fair Hearing, he would not have been able to see the exhibits presented to the Hearing Panel or the documents ECCA chose to provide for the Hearing.

423.   Dr. Patil was the first in recent memory, and over a decade, to request a Fair Hearing. This is because the asymmetry of power is so great that Faculty are pressured to acquiesce or leave the institution rather than protest unjust recommendations and actions, as Dr. Patil chose to do here.

424.   As Dr. Patil testified, one of the reasons he exercised his right to the Hearing was so that the truth would be revealed about his practice and the investigative process.

   a. Dr. Patil was informed, in writing and as stated in the Bylaws, that not asking for the Hearing indicated agreement with **_ALL_** the adverse findings against him and his practice.

   b. This "all or nothing" ultimatum maximized the complexity and duration of the investigation.

89

      c.  It also adversely impacted Dr. Patil by forcing him to remain out of

practice and further isolated him from his patients and colleagues.

425.   What happened to Dr. Patil could happen to anyone, and the Hearing

Panel had a duty to weigh whether the proper procedures were followed, to ensure

objectivity along with an assessment of the merits, yet this was disregarded.

426.   In this so-called Fair Hearing, Dr. Patil's testimony was credible,

sincere, and addressed every single allegation in detail.

427.   Dr. Patil was required to address smears on his reputation, character,

and clinical practice. He was forced to recall events going back over ten (10) years.

428.   Dr. Patil addressed every single allegation and every single attack—not

gratuitously or for enjoyment. He did so out of pure necessity and survival, and

because the Fair Hearing Plan required him to meet this colossal burden.

### 1. Flaws in the Departmental Investigation

429.   The Panel should have carefully considered the significance of the fact

that the Departmental Investigation that triggered Dr. Patil's indefinite suspension

from Practice was flawed and tainted.

430.   The Departmental Investigation was the only basis for initially

suspending Dr. Patil's Practice and any notion that the Departmental and

Institutional Investigations were independent was false, since some individuals served on both Committees.

431.   The Departmental Investigation did not question Dr. Patil as required by U of M policies.

432.   The Departmental Investigation was not conducted according to Policy 04-06-052 or Office of Clinical Affairs guidance documents.

433.   The Institutional Investigation Chair, during sworn Hearing testimony, indicated in his direct examination by OCA outside counsel and cross-examination that members of the Departmental Committee denied their involvement, denied its existence, and ***_destroyed the materials_*** that formed the basis of a scathing Departmental Investigation Executive Summary, which ECCA nonetheless included as an exhibit.

434.   Defendant Lozon spoke extensively about the Departmental Investigation Report and hundreds of pages of support, but none of this documentation was ever produced.

435.   In fact, no more than a five bullet-point summary was provided to Dr. Patil as the outcome of the Departmental Investigation, until exhibits were exchanged for the Fair Hearing, years later. Dr. Patil was never told in detail what he was accused of or the true nature of the investigations.

436.   On September 20, 2019, Dr. Patil was given a copy of Policy 04-06-052 and told it would govern the Departmental Investigation. Dr. Patil asked many questions, but none were answered.

437.   ECCA presented the unreasonable Remediation Plan as an exhibit.

438.   ECCA presented the Departmental Investigation Committee's findings as an exhibit. But the Defendants want all to ignore the flaws in how any findings were formed.

## 2. Flaws in the Institutional Investigation

439.   The Institutional Committee investigative process reached inaccurate conclusions, and thus the basis for any recommendations were not only arbitrary, capricious, and unreasonable, but also not based in fact.

440.   There exists no process of reviewing the Minutes of the Institutional Committees meetings for accuracy. Witnesses were not permitted to review the notes to see if their statements were accurately summarized.

441.   The findings themselves had no basis in fact, and even if the findings were accurate, which they were not, the recommendations that followed were unreasonable to address the allegations presented.

442. Regarding an allegation of excessive complications with a surgical procedure called microvascular decompression (MVD), Dr. Patil's rates of complications in MVD were no greater than those reported in the literature and lower than ALL of his Defendant U of M colleagues.

443. Though his testimony was limited by the Hearing Officer, Dr. Patil presented detailed and sophisticated testimony along with multiple documents that included various literature demonstrating: (1) that the Institutional Committee presented an inaccurate interpretation of the literature used to formulate its opinion, and (2) that Dr. Patil's rates were lower than other Defendant U of M Neurosurgeons (which was a measure specifically charged to the Service Level Committee by Defendant Lozon in her directive).

444. It is important to keep in mind that ECCA's own exhibits show that virtually no documentation existed prior to either review that showed significant clinical concerns (in almost 15 years of Dr. Patil's practice.). The significance of this should not be understated or ignored.

445. Also reflective of a tradition of excellent care by Dr. Patil are the consistently positive reports from Ongoing Professional Practice Evaluations (OPPE), reviews from department leadership, and positive feedback from patients.

446.   Ongoing Professional Practice Evaluations (OPPE) scorecard for Patient Care, Professionalism, Patient Experience, and National Database Indicators met or exceeded Peer Scores.

447.   Regarding the frivolous allegations of a high rate and poor management of infectious complications in DBS, Dr. Patil's practice was also consistent with the published literature.

448.   Regarding frivolous allegations about improper differentiation between patient care and research, these allegations by the Departmental Committee and Institutional Committee were debunked by not just one, but two independent investigations.

449.   Following referral by the Institutional Committee, the IRB itself suspended Dr. Patil's research and conducted a second Investigation, which agreed with Dr. Hutchinson that there were no areas of concern. Dr. Patil requested that these Reports be provided to include in ECCA exhibits, but this request was ignored.

450.   Regarding inadequate research or clinical documentation, ECCA presented no evidence or even one specific example in any of its testimony or exhibits to support this false allegation.

451.  By contrast, Dr. Patil's testimony, along with evidence presented, showed that his documentation has been in accordance with his training and consistent across multiple well-established research institutions.

452.  Furthermore, the reported findings of the Committee appear to be purely speculative, citing the potential for confusion or miscommunication. However, no specific examples were provided.

453.  In addition, Dr. Patil and his counsel repeatedly asked to be provided with written guidelines for documentation that are uniformly applied to all Defendant U of M faculty.

454.  There was no indication that Dr. Patil has failed to meet any such uniform standards in his practice.

455.  Regarding allegations that Dr. Patil has been disrespectful to others, including female colleagues, these allegations were systematically debunked.

456.  Close examination revealed flaws in each so-called Patient Safety Report (PSR). There was a demonstrable lack of appropriate objective investigation and policy-required follow-through by the Committee. The Institutional Committee did not investigate one claim in any PSR that was used as the basis for its opinions – each was accepted as true for their investigative purposes. All were attenuated during Fair Hearing testimony, and debunked by Dr. Patil and other witnesses.

95

457. There was a systematic and deliberate failure for Defendant Muraszko to obtain balanced reports that represented all sides of events. This concern was not explored by the Committee during its investigation.

458. Unfortunately, none of the specific instances or reports were discussed with Dr. Patil in his interviews, making it difficult to determine how the Committee findings could have been made in an unbiased manner.

459. Sworn Affidavits presented as evidence (i.e., Sworn Affidavits of Barbee, Zeitlin, Lanava, Conrad, Houshmand, Askari), along with the testimonies of Lupo, Chiravuri, and Mackenzie all supported the fact that Dr. Patil has always been a consummate professional, respectful of others, and personified this attitude with remarkable consistency during his time at Defendant U of M.

460. Each person who testified in person on Dr. Patil's behalf was credible and reliable. Each Affidavit was presented by an individual with full transparency and swearing under Oath as to the truth and veracity of the statements, unlike the statements provided in each PSR and interview notes in ECCA's exhibits.

461. While Dr. Patil had the burden of proof, ECCA was required to produce evidence, not just allegations and innuendo, supporting its position.

462. Dr. Patil presented experts that addressed both the clinical and behavioral concerns presented by ECCA, and those experts thoroughly extinguished the substance of ECCA's allegations.

463. The egregious and persistent violations of Defendant U of M policies should not be downplayed or ignored when considering the procedural and ethical deficiencies in this process and disciplinary action.

464. On October 18, 2021, a letter by Defendant Lozon cites "the concerns and issues that were more fully addressed in previous letters addressed to you (July 14, 2020, and August 4, 2020) and your failure to comply with the comprehensive retraining, assessment, evaluation and remediation plan specified therein."

465. The Second Notice only refers to the documents and does not provide specific reasons, as required. The non-renewal was clearly arbitrary and capricious as it came just days before the first day of the Hearing and was due to Dr. Patil not following their demanded recommendations that he exercised his right to challenge pursuant to the Fair Hearing.

466. Dr. Patil has complied with requirements for continuing staff privileges.

467.   The Policy Violations are significant not only to show the arbitrary and capricious nature in which these actions were carried out, but also the importance of highlighting that this continued Suspension was improper this entire time.

468.   Dr. Patil engaged in extensive efforts to continue communication with Professional Renewal Center after credible and serious concerns were raised about Acumen. The Office of Clinical Affairs refused to maintain communication.

469.   Dr. Patil testified as to the extensive efforts to engage with a Behavioral Health Institution in order to at least initiate his return to practice in some form.

470.   First, it was not sufficient for ECCA to claim that Dr. Patil simply "did or didn't enroll" but rather that his efforts to enroll were impeded by the Office of Clinical Affairs who engaged in very troubling behavior. This includes, but is not limited to, explicitly refusing to provide Dr. Patil with any written report (in writing) while claiming a "verbal report of findings" is sufficient—unheard of in any healthcare setting.

471.   Each PSR, each policy, each timeline, and each claim that ECCA used to support its actions for non-renewal and its remediation plan should have been subject to scrutiny, and all documents and testimony presented by Dr. Patil to contradict these points should have been considered by the Hearing Panel.

472.   At every stage, Dr. Patil cooperated and invited inquiry and urged individuals and Committees to "shine a light and reveal the truth."

473.   The non-renewal on these grounds is baseless as Dr. Patil not only had a right to challenge the recommendations and actions (for which he has been punished with non-renewal of privileges), but he made tireless efforts to engage, at the very least, in this Behavioral Health Program portion of the recommendations for months without any reciprocity or return to practice.

474.   Only highly selective documentation of the communications between the Office of Clinical Affairs, Acumen, and PRC were included in ECCA exhibits, but Dr. Patil's testimony and evidence showed the truth behind these efforts.

475.   The proposed restrictions on Dr. Patil's Practice were unreasonable, went beyond the bounds of dignity and decency, and were only rivaled by the recommendations and actions taken throughout the continued and inappropriate suspension of his Practice.

476.   Dr. Patil proved this point by clear and convincing evidence, and deserved to return to practice, as was the purported intent of the Institutional Committee, ECCA, and Defendant U of M.

477.   The restrictions on his interactions with patients (even in Clinic), ability to take call, having to be supervised while interacting with Residents over the

shoulder observation for all procedures, and other specifics of the Plan were not tailored to patient safety, but served to undermine and humiliate Dr. Patil, and would ultimately weaken the confidence in the Residents he trains and the patients he treats.

478.   The initial Precautionary Suspension, the continued Suspension (of which there is no basis under the Bylaws), and the Institutional Committee recommendations were unreasonable not only because they were not based in fact, but the measures themselves would have been unreasonable even if their findings were supported by fact.

479.   The clinical recommendations were overbroad and ignored over 90% of Dr. Patil's practice. The behavioral recommendations were also unreasonable for the allegations that were presented.

480.   Dr. Patil understood that it had been two (2) years since he operated, and even though physicians with sabbaticals are able to return with no restrictions, he was willing to consent to two months of over the shoulder observation upon his return to practice to restore this confidence in peers and colleagues alike.

481.   To conditionally return to his Practice based on adherence to unreasonable recommendations would be inequitable and impractical.

482.   Unreasonable recommendations included extensive travel not only for clinical training purposes, but also for behavioral reprogramming that would result

in continuous interruption of Dr. Patil's practice and a hinderance to seamless transition back into a cordial and amicable work environment.

## V. Defendants' actions caused irreparable harm to Patients, to Colleagues, and to Dr. Patil.

### 1. Irreparable Harm to Patients

483. The actions of Defendant Muraszko and Defendant U of M Administration have already and will do additional and irreparable harm to Dr. Patil, his patients, his colleagues, and the clinical programs that he directs.

484. Significant and irreversible harm has been done to Dr. Patil's patients and other patients of Defendant U of M.

485. Due to the abrupt way his Clinical Privileges were revoked, numerous patients had critical surgeries delayed or canceled, often for months.

486. Patients who had surgery scheduled at the beginning of this process were awaiting surgery with Dr. Patil for about a year after his suspension. In some cases, the result has been the loss of independence and the loss of ability to care for themselves.

487. Patients who had been living independently were moved to nursing homes. The quality of life lost can never be returned.

101

488.  In addition, in his absence, Neurosurgeons less qualified and experienced than Dr. Patil stepped in to perform procedures in which he has an international reputation and an established track-record for excellence.

489.  Finally, patients were kept in the dark, and Dr. Patil was prohibited from contacting them.

490.  This has caused significant distress for both patients and the colleagues who were required by Defendant U of M to keep them in the dark.

## 2. Irreparable Harm to U of M Programs and Colleagues

491.  Dr. Patil spent 15 years building nationally recognized Programs in Deep Brain Stimulation, Ablative Neurosurgery for Cancer Pain, and other forms of Neuromodulation at U of M.

492.  The actions of Defendant Muraszko and Defendant U of M Administration have caused significant and potentially irreparable harm to these Programs.

493.  The negative experience for the patients who had entrusted Defendant U of M with their care has badly injured the previously strong relationship of these U of M Programs and referring physicians.

102

494.   Defendant U of M was unable to see new patient referrals, so they have been sent elsewhere.

495.   In addition, Dr. Patil received messages, out of respect and concern from outside colleagues, when patients have abandoned Defendant U of M to seek care elsewhere, to which he has been prohibited from candidly replying.

496.   Referring physicians are now sending patients to other centers—not Defendant U of M.

### 3. Irreparable Harm to Dr. Patil Himself

### a. Reputational and Social Harm

497.   Confidentiality regarding Dr. Patil's clinical absence has **_not_** been maintained.

498.   First, information regarding the Investigation was intentionally shared with a Resident Trainee by an attending Neurosurgeon, prompting fear that working with Dr. Patil would destroy the Trainee's career.

499.   The Resident shared the additional fear that divulging the breach to Dr. Patil would result in retaliation from the other attending Neurosurgeon.

500.   The damage and fear were very real and intense for the trainee and for Dr. Patil.

501.   In an unprecedented action and for the first time in 15 years, some Residents ignored Dr. Patil's emails.

502.   Second, an email sent to eighteen (18) Department members on the morning of December 24, 2019, less than 24 hours after Dr. Patil received the Letter of Suspension of his Practice from the Office of Clinical Affairs, begins, "As you may have heard, Dr. Patil is currently on Administrative Leave."

503.   This email was both inaccurate and was extremely upsetting to Department members.

504.   In addition, the opening phrase, "As you may have heard," is an example of how inappropriate and inaccurate open discussion was already taking place about Dr. Patil, even before he received written notification of his removal from Clinical practice.

505.   Third, an email sent by Defendant Muraszko, on February 4, 2020, to three (3) Administrators regarding Dr. Patil's Clinic reads, "I would move these patients as my last conversation with the Office of Clinical Affairs suggests Committee has not yet been formed."

506.   There is no reason that the smooth functioning of the Department required Administrators to know that the Office of Clinical Affairs had any

involvement in Dr. Patil's clinical absence or required Administrators to know the status of the Institutional Investigation.

507. To make matters worse, Defendant Muraszko's email was then forwarded by one of the Administrators to additional Neurosurgeons, and then forwarded further to staff.

508. Dr. Patil has been deliberately ostracized from the Department.

509. Defendant Muraszko intentionally and secretly removed Dr. Patil, without notification, from the group email list that is used to conduct most important Neurosurgery business.

510. Dr. Patil's first concerned emails to the Department of Neurosurgery Administration, sent when he failed to receive information about a faculty meeting, prompted no action.

511. It was only after Dr. Patil persistently inquired over weeks that the intentional deletion of his name was finally acknowledged and corrected.

512. With these actions of which he is aware, and likely many more others that remain unknown to him, Dr. Patil has been effectively ostracized.

513. The actions of the Defendant Muraszko, Defendant Sullivan, and Defendant U of M has irreparably damaged the position and reputation of Dr. Patil without due process or even completion of the badly flawed investigative process.

105

## b. Professional and Financial Harm

514.   Allowing Dr. Patil's medical staff membership and privileges to lapse provides false credence to the reputational harm that has already been imposed on Dr. Patil.

515.   Even a temporary loss of privileges does enormous and irreparable damage to Dr. Patil professionally, far beyond any financial effects.

516.   Hospital credentialing applications universally ask questions which, to date, Dr. Patil has been able to answer in the negative.

517.   These questions will now demand a positive response, even after Dr. Patil is cleared of all concerns. These standard questions include:

   a.   "Has your professional employment ever been suspended, diminished, revoked, or terminated at any hospital or healthcare facility or are any proceedings that may result in any such action currently pending?"

   b.   "Have your medical staff appointment/privileges ever been limited, suspended, diminished, revoked, refused/denied, terminated, restricted, not renewed, relinquished (whether voluntarily or involuntarily) at any hospital or healthcare facility or are proceedings currently pending which may result in any such action?"

106

c. "Have you ever withdrawn (or voluntarily relinquished) your application for appointment, re-appointment or privileges or resigned from the medical staff because disciplinary action\*\* or loss or restriction of clinical privileges was threatened or before a decision about your appointment and/or privileges was rendered by a hospital's or healthcare organization's governing board?"

d. "Have you ever been the subject of disciplinary action or proceedings at any healthcare facility?"

e. "Have you ever been investigated for scientific misconduct?"

518.   Reporting Dr. Patil to the National Practitioner Data Bank (NPDB) compounds this negative impact.

519.   Hospitals and State Licensing Boards considering a Physician's Application for hospital privileges, or a State Medical License are permitted by statute to "query" information in the NPDB and are often procedurally required to do so.

520.   Hospitals query the NPDB for the granting, maintenance, or expansion of a physician's clinical privileges, including temporary locum tenens privileges.

521.   Therefore, any adverse actions reported on the NPDB will be scrutinized by any future prospective hospital employer.

522.   Additionally, hospitals must report to the NPDB, and applicable State Licensing Boards, any professional review actions reasonably related to professional competence or conduct adversely affecting clinical privileges for a period longer than 30 days.

523.   Therefore, Defendant U of M's report to the NPDB will likely trigger disciplinary inquiries by other entities.

524.   The aggressive way Defendant U of M has chosen to conduct the Investigation of Dr. Patil appears to have been constructed to inflict maximum retributive damage to his reputation, even before the Investigation was underway.

525.   Dr. Patil is regularly recruited to leadership positions at other institutions. However, the need to truthfully answer about the ongoing Investigation and his Practice have had a chilling effect. In short, he has been essentially trapped at Defendant U of M.

526.   Dr. Patil's access to records, despite being a part of Staff and actions to be held in abeyance per the Bylaws, were revoked *during* the Hearing, which impacted his ability to defend himself during the Hearing, and largely scuttled his ability to continue in his role as a Clinical Researcher. At the same time, Dr. Patil has now been asked to support fifty (50) percent of his salary through research support.

108

527.   The impacts of loss of hospital privileges and reporting to the NPDB do not describe the limits to the irreparable professional damage to Dr. Patil.

528.   Loss or limitation of hospital privileges can also result in a loss of American Board of Neurological Surgery Board Certification.

529.   This Certification requires that hospital privileges be unrestricted and that there be no adverse actions by the hospital.

530.   Board Certification is a requirement of new privileging in multiple centers, including U of M.

531.   The actions of the Defendant Muraszko and the Defendant U of M Administration will place a permanent red flag on any future application by Dr. Patil for another position or clinical privileges.

532.   The actions of Defendant U of M, if allowed to remain, will permanently short-circuit the dream that Dr. Patil has pursued for 40 years. He will no longer be a Board-Certified Neurosurgeon.

533.   Finally, there is a long-lasting snowball effect. Federal laws and regulations governing the Medicare and Medicaid programs and the NPDB are of paramount importance in the insurance and credentialing contexts for the medical profession.

534.   Highly prejudicial disciplinary action (e.g., any loss of License or material restriction on practice, etc.) reported against a physician, can result in disciplinary or legal "piling on" by other health care entities and insurance networks.

535.   Due to the actions of Defendant U of M, despite his previously impeccable reputation, Dr. Patil might not meet the professional or ethical qualifications required by credentialing entities and will face an uphill battle to maintain his License, Certifications, and insurance provider contracts.

536.   From a financial standpoint, Dr. Patil has had no opportunity to increase his salary through raises or promotion to full Professor.

537.   The promised 8% pay increase never materialized, and even routine salary increases have been withheld throughout the three-year investigation.

### c.  Psychological Harm and Health Impairment

538.   Dr. Patil has already suffered irreparable psychological harm which will be only compounded by the actions of Defendant U of M to rescind his credentialing.

539.   The trauma of working in a hostile environment, being subject to documented and witnessed verbal abuse and public humiliation by a colleague, not only without corrective action from Defendant U of M Administration but with

endorsement by Defendant Muraszko, and the stress of a year of accusation and investigation without opportunity for response, has done enormous psychological harm to Dr. Patil.

540.   The unjustified loss of privileges, together with the stress that comes with knowledge of the professional harm and the experience of the reputational harm caused by the actions of Defendant Muraszko and the Defendant U of M Administration, caused further and potentially irreversible psychological harm.

541.   As in other cases of abuse, the mental trauma is long-lasting and can damage the individual as well as the family.

542.   The psychological harm done to Dr. Patil has resulted in the need for regular therapy, night terrors, stress-related weight gain, and the aggravation of long quiescent inflammatory bowel disease.

## V. CLAIMS FOR RELIEF

## COUNT I
## VIOLATION OF AMERICANS WITH DISABILITES ACT OF 1990
## 42 U.S.C. 1201 *et seq.*

543.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

544.   At all relevant times, Dr. Patil was an employee of Defendant U of M.

545.   At all relevant times, Dr. Patil was an individual with a disability, in that he has a physical impairment, hearing loss, that substantially limits one or more of his major life activities, his ability to hear, and has a record of the impairment.

546.   Dr. Patil is qualified for his position, as he is an individual who performs the essential functions of the job of a Neurosurgeon and Associate Professor with Tenure at Defendant's hospital and university.

547.   The ADA makes it unlawful to discriminate against a qualified individual in the terms and conditions of employment on the basis of disability. *42 U.S.C. 12112 (a).*

548.   Defendants engaged with malice and with reckless indifference to Dr. Patil's federally protected rights with respect to his hearing disability, in the following manner:

    a.  Defendant Muraszko was aware of Dr. Patil's hearing disability from 2010 but showed no appreciation or accommodation of it.

    b.  There was no accommodation, despite awareness by Defendant Muraszko, of Dr. Patil's hearing disability, which is specifically evident in meeting environments when several individuals are speaking at the same time.

112

c. Dr. Patil is the only clinical faculty member, to his knowledge, with a hearing disability.

d. At the Morbidity and Mortality Conference on February 7, 2019 at which Dr. Patil was verbally abused by Defendant Sullivan, Defendant Muraszko condescendingly and stereotypically said that Dr. Patil "did not get it," referring to synthesis of multiple simultaneous conversations and whisperings in a crowded conference room.

e. Most or possibly all of a hearing disabled individual's adverse communication with colleagues may involve misunderstanding related to poor hearing, either alone or in the comprehension of what was said and subsequent reactions.

f. This includes, but is not limited to, allegations that Dr. Patil was speaking loudly or ignoring colleagues. These allegations were made with knowledge of Dr. Patil's hearing disability over the years, including, but not limited to: 2019-2022 with continuous and perpetual violations.

g. While some of the individuals who reported concerns may or may not have been aware of Dr. Patil's disability, the individuals receiving the complaints and ultimately tasked with investigating and acting on them

113

were fully aware of his disability and maliciously ignored them while refusing to get his side of the story.

h. In fact, Defendants used these interactions to paper Dr. Patil's file and use them against him in disciplinary recommendations, actions, and proceedings.

549. Making accommodations for Dr. Patil's hearing disability would not have imposed any undue or substantial burden (financial or otherwise), on Defendants whatsoever.

550. Defendants were in continuous violation of the Americans with Disabilities Act, including in its actions to revoke his medical staff membership in February of 2023.

551. Dr. Patil reported this form of discrimination and others to multiple Defendant Administrators, including Defendant Muraszko, EVDAA Bradford, Defendant Lozon, and OIE Associate Director David Betts. Defendant U of M protections were inadequate. Rather than responding to Dr. Patil's concerns, the result was dismissal, avoidance, and retaliation for speaking out.

552. As a direct and proximate result of Defendants' discrimination based on hearing disability, Dr. Patil suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity;

114

damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation;

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT II
## VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (PWDCRA)
## M.C.L. §37.1101 *ET SEQ.*

553.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

554.   At all material times, Dr. Patil was an employee and Defendant U of M was his employer covered by and within the meaning of the PWDCRA, M.C.L. §37.1102(d).

555.   As described above, Dr. Patil suffers from a hereditary, progressive hearing disability which constitutes a disability, as that term is defined by and within the meaning of the PWDCRA.

556.   Dr. Patil is the only clinical Neurosurgical faculty member with a hearing disability. The practices of the department make no accommodation for this, despite awareness by the Chair and repeated requests for accommodation.

557.   At the time of his suspension, Dr. Patil's hearing disability was unrelated to his ability to perform his duties as a Neurosurgeon and Associate Professor with Tenure at U of M. His hearing disability is unrelated to his qualifications for employment as an Associate Professor with Tenure.

558.   Dr. Patil was discriminated against when Defendant U of M precluded him from returning to work and took other adverse employment actions against him as described herein.

559.   Dr. Patil's hearing disability was a determining factor in the Defendant U of M's decision to preclude him from returning to work and in taking the adverse

employment actions against him as described herein, including in February 2023 when his staff membership was revoked.

560. The actions of Defendant U of M and its agents, representatives, and employees were intentional in their disregard for the rights and sensibilities of Dr. Patil.

561. This includes, but is not limited to:

    a. Embarrassing and humiliating Dr. Patil, in the presence of other colleagues, administrators, students and others, to diminish his reputation at Defendant U of M.

    b. Remarks such as "We don't speak the same language" at a Mortality and Morbidity Conference in 2019, which was reported and ignored in the subsequent years of 2020-2023 with no action taken by Defendants toward that physician and continued disciplinary action against Dr. Patil.

562. Defendants have discriminated against Dr. Patil because of his disability as described in the foregoing Count.

563. As a direct and proximate result of Defendant's unlawful discrimination, Dr. Patil has sustained injuries and damages, including the loss of earnings and earning capacity, loss of fringe and pension benefits, mental and

emotional distress, humiliation and embarrassment; loss of career opportunities; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT III
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## AS AMENDED (TITLE VII), 42 U.S.C. §2000e, *et. seq.*
## SEX

564.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

565.   At all relevant times, Dr. Patil was an employee of Defendant U of M.

118

566.   Title VII makes it an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin.

567.   Dr. Patil is male, while Defendant Lozon (Chief of Staff) and Defendant Muraszko (Chair of Neurosurgery), both key decision makers in the events giving rise to this Second Amended Complaint, are both female.

568.   Defendants have violated Title VII, with respect to sex, in the following ways:

    a.   On rare occasions when professional disagreements have arisen between Dr. Patil and a female colleague, the Defendants Muraszko and Lozon, both of whom are female, have repeatedly accused Dr. Patil of unprofessionalism and initiated a disciplinary action without notifying him or seeking his account of events.

    b.   Defendants Muraszko and Lozon applied a clear double standard, based on sex, to resolve any conflicts between Dr. Patil and colleagues. This double standard was acknowledged and its gender-based origins made clear by Department administration.

c.  Such discrimination extended to more senior Defendant Administrators who carried out one-sided investigations that made demonstrably false statements and reached false conclusions.

d.  Actions were notably taken in instances where the encounter involved a female colleague or staff member.

e.  Dr. Patil reported discrimination based on sex on multiple occasions: to Associate Director David Betts in the Office of Institutional Equity (OIE) on February 11, 2019, to Executive Vice Dean Bradford on February 22, 2019, and the Defendant Lozon in the Office of Clinical Affairs on May 2, 2019. To Dr. Patil's knowledge, there was no follow-up, and no action was taken. Dr. Patil was powerless to take such actions unilaterally to resolve those concerns beyond reporting them.

f.  Despite Dr. Patil's full and complete cooperation, and the false premises underlying any OCA disciplinary action, the injustice of this discrimination was later compounded and used against Dr. Patil in an adverse employment decision, including, but not limited to, his removal from medical staff membership in 2023.

g.  Dr. Patil's experience is part of a pattern or practice of discrimination based on sex at Defendant U of M, particularly within the OCA,

120

directed by Defendant Lozon. In currently ongoing professionalism investigations against Dr. Patil and other surgeons, to the best of Dr. Patil's knowledge, all the targets of OCA investigations are male. In each case, OCA applies discriminatory male gender-based stereotypes to these individuals without evidence and through biased investigation.

h. When Dr. Patil requested an equity evaluation at his December 14, 2017, annual review, Defendant Muraszko told him, "You are the wrong race and the wrong sex to have equity in compensation."

i. The issue of compensation had since been brought up by Dr. Patil on numerous occasions, including attempts to address it during the so-called fair hearing repeatedly from 2020-2022, and in each instance, he was rebuffed before Defendants ultimately decided to take retaliatory and adverse action against him. This includes, but is not limited to, his removal from medical staff membership in February 2023.

j. Dr. Patil was punished with materially adverse changes in the terms and conditions of his employment. This includes, but is not limited to: being prohibited from performing *any* operation on patients despite the wide range in his repertoire, being prohibited from seeing patients clinically, being denied access to patient medical records, not only for clinical but

121

also any research work (this occurred during the hearing while the matter was supposedly being adjudicated internally), being removed from the hospital medical staff, substantially altering his roles in research and teaching due to his removal from medical staff, and receiving a drastic cut in his monetary compensation.

k.  These changes occurred precisely due to the actions of Dr. Muraszko as his Chair who oversaw and implemented his wrongful suspension and corrupt investigation both before and onwards during the so-called Fair Hearing, Dr. Sullivan who conspired with Dr. Muraszko to materially alter the terms and conditions of his employment and Dr. Patil's ability to practice medicine, Dr. Lozon abusing her role as Chief of Staff and Chair of OCA and ECCA in conspiring with Drs. Muraszko and Sullivan to deny Dr. Patil due process and prevent him from practicing medicine for over 2 years before the matter could be adjudicated internally, and Dr. Lozon overseeing and implementing the process to remove him from medical staff and force a decrease in Dr. Patil's compensation.

l.  These materially adverse changes in the terms and conditions of Dr. Patil's employment occurred for years and continue to this day. They

122

occurred under the watch and full approval of Defendant Regents, who govern and control University of Michigan's Health Systems and Michigan Medicine, and are responsible for all the decisions of the leadership, employees, staff, boards, panels, and committees implementing these decisions.

m. The denial of Dr. Patil's reappointment to the medical staff is not an independent action by an entity not within the control of the Regents, but an action taken by Defendant Regents, through its underlings, subsidiaries, and employees in Michigan Medicine, including all individual defendants, denied Dr. Patil's reappointment to the medical staff in violation of Title VII.

n. The denial of reappointment to medical staff is a decision with monumental and irreversible consequences that will impede and could entirely prevent any physician, particularly one with a procedural specialty, from finding future employment.

o. Dr. Patil's role in the medical staff is inextricably linked to his employment in Michigan Medicine in that such membership can shape and define his various roles, his compensation, his research, his

teaching, and other notable responsibilities that define his current and future employment in this or other institutions.

p. Thus, the decisions of ECCA, OCA, HHCEB, and other bodies, under the umbrella and authorization of the Regents, are effectively employment decisions for the University and were conducted in violation of Title VII.

569. Furthermore, all past and ongoing adverse actions will continue until Dr. Patil is terminated, constructively discharged, or until he is allowed to apply for medical staff membership again at Michigan Medicine (which is not permitted for at least 5 years) and in the highly unlikely event it will be approved.

570. As a direct and proximate result of Defendants' unlawful actions, under Title VII, Civil Rights Act of 1964, as amended, Dr. Patil has suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter

a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT IV
## VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (ELCRA) DISCRIMINATION M.C.L. 37.2101 *et seq.* BASED ON SEX

571.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

572.   The ELCRA prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment, because of race, color, sex, or national origin. MCL 37.2202(1)(a).

573.   Defendant U of M, by and through its agents, representatives, and employees, including but not limited to Defendant Lozon, Defendant Muraszko, and Defendant Sullivan, took adverse employment actions against Dr. Patil regarding the

terms and conditions of his employment with Defendant U of M on the basis of his sex.

574.   Dr. Patil was punished with materially adverse changes in the terms and conditions of his employment. This includes, but is not limited to: being prohibited from performing *any* operation on patients despite the wide range in his repertoire, being prohibited from seeing patients clinically, being denied access to patient medical records, not only for clinical but also for any research work (this occurred during the hearing while the matter was supposedly being adjudicated internally), being removed from the hospital medical staff, substantially altering his roles in research and teaching due to his removal from medical staff, and receiving a drastic cut in his monetary compensation.

575.   These changes occurred precisely due to the actions of Dr. Muraszko as his Chair who oversaw and implemented his wrongful suspension and corrupt investigation both before and onwards during the so-called Fair Hearing, Dr. Sullivan who conspired with Dr. Muraszko to materially alter the terms and conditions of his employment and Dr. Patil's ability to practice medicine, Dr. Lozon abusing her role as Chief of Staff and Chair of OCA and ECCA in conspiring with Drs. Muraszko and Sullivan to deny Dr. Patil due process and prevent him from practicing medicine for over 2 years before the matter could be adjudicated

126

internally, and Dr. Lozon overseeing and implementing the process to remove him from medical staff and force a decrease in Dr. Patil's compensation.

576.   These materially adverse changes in the terms and conditions of Dr. Patil's employment occurred for years and continue to this day. They occurred under the watch and full approval of Defendant Regents, who govern and control University of Michigan's Health Systems and Michigan Medicine, and are responsible for all the decisions of the leadership, employees, staff, boards, panels, and committees implementing these decisions.

577.   The denial of Dr. Patil's reappointment to medical staff is not an independent action by an entity not within the control of the Regents, but an action taken by Defendant Regents, through its underlings, subsidiaries, and employees in Michigan Medicine, including all individual defendants, denied Dr. Patil's reappointment to the medical staff in violation of the ELCRA.

578.   The denial of reappointment to the medical staff is a decision with monumental and irreversible consequences that will impede and could entirely prevent any physician, particularly one with a procedural specialty, from finding future employment.

579.   Dr. Patil's role in the medical staff is inextricably linked to his employment in Michigan Medicine in that such membership can shape and define

his various roles, his compensation, his research, his teaching, and other notable responsibilities that define his current and future employment in this or other institutions.

580.   Thus, the decisions of ECCA, OCA, HHCEB, and other bodies, under the umbrella and authorization of the Regents, are effectively employment decisions for the University and were conducted in violation of the ELCRA

581.   Furthermore, all past and ongoing adverse actions will continue until Dr. Patil is terminated, constructively discharged, or until he is allowed to apply for medical staff membership again at Michigan Medicine (which is not permitted for at least 5 years) and in the highly unlikely event it will be approved.

582.   As a direct and proximate result of Defendants' unlawful actions, Dr. Patil has sustained injuries and damages, including but not limited to loss of earnings and earning capacity, loss of career opportunities, loss of goodwill, severe harm to his business reputation, severe harm to his clinical reputation, loss of esteem and standing in the medical community, humiliation and embarrassment, mental and emotional distress, and loss of ordinary pleasures of life.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for

damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT V
## VIOLATION OF AMERICANS WITH DISABILITIES ACT OF 1990
## 42 U.S.C. 1201 *et seq.*
## - RETALIATION

583.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

584.   At all relevant times, Dr. Patil was an individual with a disability, in that he has a physical impairment, hearing loss, that substantially limits one or more of his major life activities and has a record of the impairment.

585.   Dr. Patil engaged in activity protected under the ADA when he opposed conduct by Defendants which Dr. Patil reasonably believed violated the ADA, including:

a. Dr. Patil informed Defendant Muraszko, his supervisor, of his Hearing disability and repeatedly requested reasonable accommodation, which did not occur.

b. Dr. Patil opposed employer conduct that falsely accused him of unprofessionalism based on an alleged inability to recognize audio alerts, poor communication in noisy environments, and failure to regulate speech volume in terms of his hearing disability.

c. Dr. Patil requested reasonable accommodation for his hearing disability through an evidence-based, moderated format for the Morbidity and Mortality Conference. No change was made to the conference format.

d. Dr. Patil objected to Defendant Muraszko's unfair and derogatory attributions of irresponsibility and unprofessionalism and raised these concerns with EVDAA Bradford, OIE Associate Director David Betts, and Chief of Staff Defendant Lozon.

586.   Defendants took causally linked adverse action against Dr. Patil in the following manner:

a. Papering Dr. Patil's file with allegations from colleagues of Dr. Patil that he was speaking loudly or ignoring them;

130

b.  Failing to properly investigate such allegations and using them against Dr. Patil in disciplinary recommendations, actions, and proceedings.

c.  Accusing Dr. Patil of "going behind their back" in reporting his concerns and then making false counter-accusations.

d.  Falsely using Dr. Patil's suggestion that the Morbidity and Mortality Conference be moderated as an indication that he was unprofessional and did not take responsibility for operative complications.

e.  Ultimately, such grounds were used to unfairly remove Dr. Patil from his practice and eventually deprive him of not only his hospital credentials but also the research, teaching, and administrative aspects of his profession.

587.   After Dr. Patil engaged in his protected activity as outlined above, he was subjected to retaliatory harassment by his supervisors, as outlined above, that was sufficiently severe, pervasive, and harmful to the point that it would dissuade a medical professional with a similar disability from making or supporting a charge of discrimination.

588.   The adverse actions or severe pervasive retaliatory harassment that Dr. Patil endured was the direct result of his protected activity under the ADA.

131

589.   Dr. Patil was punished with materially adverse changes in the terms and conditions of his employment. This includes, but is not limited to: being prohibited from performing *any* operation on patients despite the wide range in his repertoire, being prohibited from seeing patients clinically, being denied access to patient medical records, not only for clinical but also any research work  (this occurred during the hearing while the matter was supposedly being adjudicated internally), being removed from the hospital medical staff, substantially altering his roles in research and teaching due to his removal from medical staff, and receiving a drastic cut in his monetary compensation.

590.   These changes occurred precisely due to the actions of Dr. Muraszko as his Chair who oversaw and implemented his wrongful suspension and corrupt investigation both before and onwards during the so-called Fair Hearing, Dr. Sullivan who conspired with Dr. Muraszko to materially alter the terms and conditions of his employment and Dr. Patil's ability to practice medicine, Dr. Lozon abusing her role as Chief of Staff and Chair of OCA and ECCA in conspiring with Drs. Muraszko and Sullivan to deny Dr. Patil due process and prevent him from practicing medicine for over 2 years before the matter could adjudicated internally, and Dr. Lozon overseeing and implementing the process to remove him from medical staff and force a decrease in Dr. Patil's compensation.

591.   These materially adverse changes in the terms and conditions of Dr. Patil's employment occurred for years and continue to this day. They occurred under the watch and full approval of Defendant Regents, who govern and control University of Michigan's Health Systems and Michigan Medicine and are responsible for all the decisions of the leadership, employees, staff, boards, panels, and committees implementing these decisions.

592.   The denial of Dr. Patil's reappointment to the medical staff is not an independent action by an entity not within the control of the Regents, but an action taken by Defendant Regents, through its underlings, subsidiaries, and employees in Michigan Medicine, including all individual defendants, denied Dr. Patil's reappointment to the medical staff in violation of ADA.

593.   The denial of reappointment to the medical staff is a decision with monumental and irreversible consequences that will impede and could entirely prevent any physician, particularly one with a procedural specialty, from finding future employment.

594.   Dr. Patil's role in the medical staff is inextricably linked to his employment in Michigan Medicine in that such membership can shape and define his various roles, his compensation, his research, his teaching, and other notable

133

responsibilities that define his current and future employment in this or other institutions.

595.   Furthermore, all past and ongoing adverse actions will continue until Dr. Patil is terminated, constructively discharged, or until he is allowed to apply for medical staff membership again at Michigan Medicine (which is not permitted for at least 5 years) and in the highly unlikely event it will be approved.

596.   Thus, the decisions of ECCA, OCA, HHCEB, and other bodies, under the umbrella and authorization of the Regents, are effectively employment decisions for the University and were conducted in violation of the ADA.

597.   Dr. Patil suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to

134

Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT VI
## VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (PWDCRA) - RETALIATION M.C.L. §37.1101 *ET SEQ.*

598.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

599.   At all relevant times, Dr. Patil was an individual with a disability as defined by the PWDCRA, in that he has a physical impairment, hearing loss, that substantially limits one or more of his major life activities and has a record of the impairment.

600.   Dr. Patil engaged in activity protected under the PWDCRA when he opposed conduct by Defendants which Dr. Patil believed violated the PWDCRA, including:

   a. Repeatedly requesting accommodation for his hearing impairment, which was not provided.

135

    b.  Exercising his rights to a Fair Hearing to dispute any adverse actions against him.

601.   Defendants retaliated against Dr. Patil in the following manner:

    a.  Papering Dr. Patil's file with allegations from colleagues of Dr. Patil that he was speaking loudly or ignoring them;

    b.  Failing to properly investigate such allegations and using them against Dr. Patil in disciplinary recommendations, actions, and proceedings.

    c.  Removing him from medical staff after he chose to exercise his option, and *his right*, to contest adverse actions through a Fair Hearing process.

602.   After Dr. Patil engaged in his protected activity as outlined above, he was subjected to severe or pervasive retaliatory harassment by his supervisors, as outlined above.

603.   The adverse actions or severe pervasive retaliatory harassment that Dr. Patil endured was the direct result of his protected activity under the PWDCRA.

604.   Dr. Patil suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment

opportunities; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation;

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT VII
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
## 42 U.S.C. 2000e *ET SEQ* – RETALIATION

605.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

606.   At all times relevant herein, Defendant U of M was Dr. Patil's employer, covered within the meaning of Title VII.

137

607. Dr. Patil engaged in activity protected under Title VII when he opposed violations of Title VII by complaining about the discriminatory conduct and comments to which he was subjected as outlined above.

608. Dr. Patil engaged in activity protected under the HCQIA which, under Federal Law, allows for him to exercise his right to a fair hearing to challenge any adverse recommendations or actions taken against him by the hospital toward his medical staffing privileges and any restrictions to his practice.

609. This includes, but is not limited to, writing numerous letters, e-mails, and engaging in various correspondence prior to the "Fair Hearing" and ultimately being penalized for the decision to participate in the "Fair Hearing" as he was not only entitled to under the Bylaws along with State and Federal law, but *required* to do so under contract, delaying his ability to seek justice and equity in the Courts.

610. Thereafter, Defendant U of M took adverse employment actions against Dr. Patil regarding the terms and conditions of his employment with Defendant U of M.

611. Further, agents, representatives, and employees, of Defendant U of M, including but not limited to Defendant Lozon, Defendant Muraszko, and Defendant Sullivan, took adverse employment actions against Dr. Patil regarding the terms and conditions of his employment with Defendant U of M.

138

612.   Dr. Patil was forced to endure an environment at Michigan Medicine that was permeated by retaliatory intimidation, ridicule, and insults that were so severe and pervasive that it altered the conditions of his employment and created an abusive working environment, not only impacting his work but also his physical and emotional health.

613.   After Dr. Patil engaged in his protected activity as outlined above, Dr. Patil was subjected to severe and pervasive retaliatory harassment by his Supervisors, as outlined above.

614.   The adverse actions and severe and pervasive retaliatory harassment that Dr. Patil endured was the direct result of Dr. Patil's protected activity under Title VII and participation in a hearing as required by the hospital to be implemented pursuant to the HCQIA.

615.   This includes telling patients that Dr. Patil cannot operate on them because he is on medical leave (a false statement), leading many to wonder about his ability to safely perform operations in the future due to such an extended medical leave and leading to speculation about his physical and mental condition to perform operations.

616.   This also includes efforts by Defendants Lozon, Muraszko, and Sullivan to engage in a campaign to alienate Dr. Patil from his Residents who he

trains, leading to strained relationships, undermining of his stature as an attending neurosurgeon, and diminishing his credibility at the institution.

617.  This also includes threats by Dr. Muraszko and Dr. Patil about punishments he would face for continuing to report discriminatory and retaliatory actions in an effort to intimidate Dr. Patil into silence and complacency.

618.  It also includes public humiliation--insulting and berating by Dr. Sullivan, including the events described in the M&M conference, further exacerbating the abusive work environment.  Dr. Lozon acknowledges that this took place and stated that he got "hot under the collar" at the M&M conference, but took no action to remediate such behavior.

619.  Other retaliatory measures included the removal of Dr. Patil from medical staff, prohibiting his ability to practice clinically, reducing his salary, stripping him of all administrative and leadership roles, preventing him from performing his clinical and translational research, and making him persona non grata at Michigan Medicine.

620.  On March 23, 2023, just three days after his meeting with the new Chair, Dr. Pandey, Dr. Patil received a letter from Dr. Pandey confirming and finalizing that his salary was cut by almost half of what he was originally earning, that he will be fired from all administrative and leadership roles, that he was to be

removed from his various committees and that he was no longer allowed to perform clinically at Michigan Medicine.

621.   Even after this Second Amended Complaint was filed, and as each day passes, Michigan Medicine continues to inflict serious financial, emotional, and reputational damage to Dr. Patil and his family that is impossible to quantify.

622.   As a direct and proximate result of Defendants' unlawful actions, Dr. Patil has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of goodwill, severe harm to his business reputation, severe harm to his clinical reputation, loss of esteem and standing in the medical community, humiliation and embarrassment, mental and emotional distress, and loss of ordinary pleasures of life.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT VIII

## VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (ELCRA) - RETALIATION M.C.L. §37.2101 *ET SEQ.*

623.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

624.   The ELCRA prohibits retaliation against any person "because a person has opposed violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MCL 37.2701(a).

625.   Dr. Patil engaged in an activity protected under the ELCRA when he opposed violations of the ELCRA by complaining about the discriminatory conduct and comments to which he was subjected, as outlined above.

626.   Thereafter, Defendants took adverse employment action against Dr. Patil regarding the terms and conditions of his employment with Defendant U of M.

627.   Further, agents, representatives, and employees of Defendant U of M, including, but not limited, to Defendant Lozon, Defendant Muraszko, and Defendant Sullivan, took adverse employment actions against Dr. Patil regarding the terms and conditions of his employment with Defendant U of M.

628.   After Dr. Patil engaged in his protected activity as outlined above, he was subjected to severe or pervasive retaliatory harassment by his supervisors, as outlined above.

629.   The adverse actions or severe pervasive retaliatory harassment that Dr. Patil endured was the direct result of his protected activity under the ELCRA.

630.   Other retaliatory measures included the removal of Dr. Patil from medical staff, prohibiting his ability to practice clinically, reducing his salary, stripping him of all administrative and leadership roles, and making him persona non grata at Michigan Medicine.

631.   On March 23, 2023, just three days after his meeting with Dr. Pandey, Dr. Patil received a letter from Dr. Pandey confirming and finalizing that his salary was cut by almost half of what he was originally earning, that he will be fired from all administrative and leadership roles, that he was to be removed from his various committees and that he was no longer allowed to perform clinically at Michigan Medicine.

632.   Even after this Second Amended Complaint was filed, and as each day passes, Michigan Medicine continues to inflict serious financial, emotional, and reputational damage to Dr. Patil and his family that is impossible to quantify.

633.   As a direct and proximate result of Defendants' unlawful actions, Dr. Patil has sustained injuries and damages, including but not limited to loss of earnings and earning capacity, loss of career opportunities, loss of goodwill, severe harm to his business reputation, severe harm to his clinical reputation, loss of esteem and standing in the medical community, humiliation and embarrassment, mental and emotional distress, and loss of ordinary pleasures of life.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT IX

## 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT

### *Procedural Due Process*
### *Property and Liberty Interests*

634.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

635.   The 14th Amendment to the United States Constitution provides that no state shall "deprive any person to life, liberty, or property, without due process of law."

636.   The 14th Amendment due process protections are required in higher education disciplinary decisions at public institutions where, as here, professors have a property interest in their positions.

637.   Defendant U of M, by and through its Administrators, always operates under color of law when making its employment decisions regarding Dr. Patil as stated above herein.

638.   Those decisions were made/or ratified by Defendant Muraszko and Defendant Lozon without any due process prior to their actions.

639.   This includes, but is not limited to, not conducting adequate investigations or interviews, not getting Dr. Patil's side of the story, violating the Bylaws over the years, and assembling secret tribunals with no transparency and

145

disposing of documents that were essential to investigations that led to his removal from practice.

640. Dr. Patil, and any physician in his position at the time, has a constitutionally protected property interest in medical staff privileges where the hospital's bylaws detail an extensive procedure to be followed when corrective action, suspension, or reduction of these privileges is going to be taken.

641. Thus, in addition to the minimum procedural process due under Federal law, the actions taken by the hospital must also be adjudged in light of constitutional due-process protections.

642. However, there were numerous flaws in how the procedure was applied in Dr. Patil's case, which resulted in the denial of minimum standards of constitutional due process.

643. This includes, but is not limited to, failure to interview Dr. Patil during the service level review, disposing of documentation that formed the bases for recommendations, secret tribunals that consisted of members denying their role in the committees and denying its very existence. This was admitted to during the so-called Fair Hearing and transcribed for the record.

644. Dr. Patil, through direct inquiry with Dr. Lozon, made a series of requests and presented many questions about how the process was conducted, who

146

was involved, how such individuals were selected, and how investigations were conducted.

645.   These inquiries were posed by Dr. Patil to Dr. Lozon directly, who refused to provide this information but was fully able to do so in her capacity under her various leadership roles.

646.   This refusal made it clear that Dr. Lozon refused to take measures that gave even the ***appearance*** of procedural due process.

647.   The Defendants acted with deliberate indifference toward their obligation to provide a workplace free from discrimination.

648.   Dr. Patil has a property interest in his medical staff privileges.

649.   These staffing privileges allow him to practice medicine and treat patients, something Dr. Patil has earned after many years of training.

650.   As a consequence of Defendants' unconstitutional acts, Dr. Patil has suffered:

> a.   Dr. Patil's hospital privileges have been taken from him;
>
> b.   Dr. Patil has been unable to practice;
>
> c.   Dr. Patil has lost surgical skills;
>
> d.   Restrictions on Dr. Patil ability to practice, and despite U of M later admitting the only practice restriction they were seeking was a

procedure that accounted for 2% of his practice, yet Dr. Patil has been prevented from his entire practice for over three years;

e. Diminishment of Dr. Patil's medical skills.

f. Removal of hospital privileges, reappointment, medical staff membership and privileges, and recertification.

g. Non-reappointment as an IRBMED member, preventing him from conducting research and justifying key portions of his non-clinical salary which he was recently informed, in March 2023, he would have to do by Dr. Pandey

h. Drastic reduction of his salary, indicating he would earn less than half of what he was earning before these events transpired.

651. Dr. Patil was stripped of these rights by Defendants without due process of law and through Defendants' continuous failure to follow and apply its own procedural safeguards afforded by its own medical staff bylaws.

652. This failure was not merely incidental or negligent, but deliberate on the part of each individual defendant under the umbrella of Michigan Medicine and the Regents of the University of Michigan.

653. This was done in a manner that violated the 14th Amendment and Defendant U of M's own Policies, which are required by State and Federal law to be

formulated by the hospital, and further required under law to afford the physician due process with regard to decisions affecting his medical staff membership.

654.   This required a Fair Hearing that took place two years after requested. During those two years, Dr. Patil was not allowed to see or operate on a single patient.

655.   The implications of non-reappointment in the healthcare profession are so harmful and profound that it may be expected to prevent physicians, especially those of procedural specialties such as surgeons, from being awarded credentials at hospitals and obtaining employment anywhere in the future. It is not merely a decision to deny privileges within that particular institution.

656.   To date, Dr. Patil has been told explicitly by multiple potential employers, in his efforts to mitigate damages and find employment elsewhere, that a key factor in their decision not to hire him is his absence from the operating room for over 2 years—the time taken by Defendants to implement and finalize his so-called Fair Hearing process.

657.   Defendants have stated their intent to withhold critical documentation from Dr. Patil.

   a.   This is documentation Dr. Patil has repeatedly requested.

149

b. This is information that is readily available and accessible to Defendants.

c. This information would not be cumbersome for Defendants to provide.

d. This information supposedly assisted Defendants in their remediation missive.

658.    Defendants have not followed the most rudimentary steps in the process for a Fair Hearing, including consistent communication and scheduling.

659.    Dr. Patil has a protected liberty interest in his good name, reputation, honor, integrity, and character, and in pursuing his chosen profession in which he has developed a national and international reputation, and which he cannot be deprived of by Defendants absent due process.

660.    That liberty interest is subject to the protections afforded by the 14th Amendment to the Constitution of the United States.

661.    Dr. Patil was entitled to process commensurate with the seriousness of the allegations against him and the potential discipline, sanctions, and repercussions he was facing. Here the allegations were of the utmost seriousness and have life-long ramifications.

662.    There would have been no undue burden on Defendants to provide due process, at a minimum that the accusations made of Dr. Patil were true and that the

burden of proof was appropriate, in that Defendant U of M already provides these due process protections to faculty in their Policies.

663.   Dr. Patil has a significant interest in his Practice, hospital privileges, reappointment, medical staff membership and privileges, and recertification.

664.   Defendants intentionally withheld from Dr. Patil all due process protections.

665.   Because Defendant U of M provided an appeals process, it had the obligation to ensure that the process was completed in accordance with due process protections as proscribed by the United States Courts and its own Policies and Statements.

666.   The ability to maintain his clinical skills, which were developed and honed throughout his entire medical career, was maliciously blocked by Defendants without due process.

667.   Dr. Patil has suffered irreparable harm to his reputation because of such actions—including the denial of his clinical privileges and a scathing and defamatory report to the State Board and NPDB regarding the reasons why those privileges were not renewed.

668.   Dr. Lozon, in her capacity as Chief of Staff, head of the Office of Clinical. Affairs, Chair of the Executive Committee of Clinical Affairs for Michigan

Medicine under Defendant Regents, and head decision maker in the current and future clinical role of staff and implementation of due process, violated Dr. Patil's constitutional rights by depriving him of the liberty and property interests he is entitled to under the Constitution through her unlawful actions.

669.   Dr. Muraszko, in her capacity as Chief of Neurosurgery and the key decision-maker regarding the implementation of investigations and due process within that department, along with Dr. Patil's ability to practice medicine, violated Dr. Patil's constitutional rights by depriving him of the liberty and property interests he is entitled to under the Constitution through her unlawful actions.

670.   Dr. Sullivan, in his capacity as Chief of Service at Neurosurgery and a key decision-maker regarding the implementation of investigations, due process, future clinical roles within the department, and Dr. Patil's ability to practice medicine, violated Dr. Patil's constitutional rights by depriving him of the liberty and property interests he is entitled to under the Constitution through his unlawful actions.

671.   All individual defendants, through both their separate and collaborative actions, violated the Constitution and Dr. Patil's constitutional rights by depriving him of his liberty and property interests by ensuring that he is unable to practice medicine at Michigan Medicine or any other institution, depriving him of due

process through multiple corrupt investigations, lengthening his time away from the operating room to such an extent that it effectively makes him unemployable anywhere else, even if fully exonerated through the internal process at Michigan Medicine, and continuing to facilitate and engage in the deprivation of his property and liberty interests afforded to him under the Constitution.

672.   Such reports and the disciplinary measures that preceded them have also maliciously blocked his ability to maintain those clinical skills in an institution outside of Michigan Medicine for the past three years.

673.   Dr. Patil will suffer years of continuous financial damage because of this deprivation of his due process. This includes loss of referrals from colleagues, less procedures that will be performed, and potential employment and salary prospects.

674.   Defendants violated their own Policies and guidelines regarding Dr. Patil's due process rights.

675.   This requires physicians to have access to a Fair Hearing and appellate review when the medical staff makes an adverse decision regarding the medical privileges of a physician.

676.   Defendants' denial of due process to Dr. Patil was arbitrary and capricious, deliberately indifferent, and fundamentally unfair.

153

677.   The effects and damages resulting from the suspension of these clinical privileges are continuing and evident, including Dr. Patil's recently salary cut, removal from medical staff, removal from various positions, titles, and roles, stoppage of his teaching and clinical and translational research, and further ostracization within the institution. The effects and damages have also been shown as multiple institutions directly informed Dr. Patil that their inability to hire him was based not on his clinical record, resume, experience, or any history of malpractice, but his removal from the operating room for over 2 years.

678.   Defendants Lozon and Muraszko, through their actions during the investigations and so-called fair hearing, along with ongoing and erroneous NPDB reports, were responsible for and were ratifying the unconstitutional decisions.

679.   Drs. Lozon and Muraszko were not mere messengers who can wash their hands from the decisions made within the Neurosurgery Department and ECCA, but were the key decisionmakers and strongly influential and instrumental in their respective roles in violating Dr. Patil's rights afforded to him under the U.S. Constitution.

680.   These rights were **clearly established to the extent that any individual with Drs. Lozon, Muraszko, and Sullivan's roles, responsibility, knowledge, education, and respective titles within their departments would**

**have understood that their actions were violating Dr. Patil's constitutional rights.**

681.   These rights were clearly established and each individual defendant, through their actions that have been clearly and repeatedly stated in this Complaint, clearly knew that such rights were being violated when they engaged in such unlawful behavior.

682.   In light of the specific case, each individual knew they were violating Dr. Patil's constitutional rights, including his rights under the 14th Amendment by depriving Dr. Patil of procedural due process along with his property and liberty interests.

683.   As a direct and proximate result of Defendants' unlawful actions, under the 14th Amendment, Dr. Patil has suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation;

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter

a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT X
## 42 U.S.C. § 1983 – FIRST AMENDMENT
## FREEDOM OF SPEECH

684.    Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

685.    Dr. Patil is a supporter of fairness. Because of his passionate advocacy for equal opportunity, he has received discipline which has cumulated in the constructive loss of his hospital privileges and staff membership.

686.    As a tenured professor at UM, Dr. Patil a public-sector employee.

687.    Along with concerns involving his employment, Dr. Patil was also speaking as a private citizen expressing a public concern and was retaliated against, which violated his First Amendment rights.

688.   Public employees have a right to speak out on matters of public concern or importance as long as the expression is not outweighed by the employer's interest in an efficient, disruption-free workplace.

689.   Dr. Patil suffered adverse employment actions in retaliation for protected speech. This includes, but is not limited to, suspension of clinical privileges, removal from medical staff, denial of access to patient records, removal of titles and leadership roles, stoppage of his teaching and clinical and translational research, and reduction in salary.

690.   Dr. Patil's engagement in protected speech was a substantial and motivating factor in his employer's decision.

691.   Dr. Patil's repeated complaints of Defendant Sullivan's outbursts have resulted in intimidation, discrimination, and discipline for his speech.

692.   Dr. Patil frequently asking for information and a Fair Hearing and getting shunned with no answers have resulted in intimidation, discrimination, and discipline for his speech.

693.   Dr. Patil's conduct as described in the preceding Paragraphs is protected under the First Amendment.

694.   Adverse actions were taken against Dr. Patil, as described in the preceding Paragraphs, and those adverse actions are such that they would deter a person of ordinary firmness from engaging in that conduct.

695.   The adverse actions were motivated, at least in part, by Dr. Patil's protected conduct.

696.   These adverse actions, which have been outlined repeatedly and in detail in this Complaint, include, but are not limited to: suspension from clinical practice, continued suspension from clinical practice for over 2 years, deprivation of due process, public smears and reporting, alienation within the department and institution, denial of access to patient records, removal of titles related to both clinical and non-clinical roles, stoppage of his teaching and research, reduction of salary, and other ongoing punitive and retaliatory actions taken by Defendants due to Dr. Patil exercising his rights under the 1st Amendment.

697.   Dr. Lozon, in her capacity as Chief of Staff, head of the Office of Clinical. Affairs, Chair of the Executive Committee of Clinical Affairs for Michigan Medicine under Defendant Regents, and head decision maker in the current and future clinical role of staff and implementation of due process, violated Dr. Patil's constitutional rights by depriving him of the liberty and property interests he is entitled to under the Constitution through her unlawful actions.

158

698.   Dr. Muraszko, in her capacity as Chief of Neurosurgery and the key decision-maker regarding the implementation of investigations and due process within that department, along with Dr. Patil's ability to practice medicine, violated Dr. Patil's constitutional rights by depriving him of the liberty and property interests he is entitled to under the Constitution through her unlawful actions.

699.   Dr. Sullivan, in his capacity as Chief of Service at Neurosurgery and a key decision-maker regarding the implementation of investigations, due process, future clinical roles within the department, and Dr. Patil's ability to practice medicine, violated Dr. Patil's constitutional rights by depriving him of the liberty and property interests he is entitled to under the Constitution through his unlawful actions.

700.   All individual defendants, through both their separate and collaborative actions, violated the Constitution and Dr. Patil's constitutional rights by depriving him of his liberty and property interests by ensuring that he is unable to practice medicine at Michigan Medicine or any other institution, depriving him of due process through multiple corrupt investigations, lengthening his time away from the operating room to such an extent that it makes him unemployable anywhere else even if fully exonerated through the internal process at Michigan Medicine, and

continuing to facilitate and engage in the deprivation of his property and liberty interests afforded to him under the Constitution.

701.   Drs. Lozon and Muraszko were not mere messengers who can wash their hands from the decisions made within the Neurosurgery Department and ECCA, but were the key decisionmakers and strongly influential and instrumental in their respective roles in violating Dr. Patil's rights afforded to him under the U.S. Constitution.

702.   ECCA made and recommendations based on findings from corrupt and flawed investigations led by Drs. Muraszko and Lozon.

703.   ECCA made and ratified recommendations under the control and leadership of Dr. Lozon, the Chief of Staff who also heads the Office of Clinical Affairs and ECCA itself.

704.   These rights were **clearly established to the extent that any individual with Drs. Lozon, Muraszko, and Sullivan's roles, responsibility, knowledge, education, and respective titles within their departments would have understood that their actions were violating Dr. Patil's constitutional rights.**

705.   These rights were clearly established and each individual defendant, through their actions that have been clearly and repeatedly stated in this Complaint,

clearly knew that such rights were being violated when they engaged in such unlawful behavior.

706.   In light of the specific case, each individual knew they were violating Dr. Patil's constitutional rights, including his rights under the 1st Amendment.

707.   As a direct and proximate result of Defendants' unlawful actions, under the First Amendment, Dr. Patil has suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation;

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

161

## COUNT XI
## BREACH OF CONTRACT

708.    Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

709.    Defendant U of M created certain policies and procedures to which Dr. Patil was entitled to rely.

710.    It is firmly established that an employer is bound by its policies and procedures under a public policy basis of legitimate expectations and/or implied in fact contracts. *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980).

711.    Implied in fact contracts are created when an employer, such as Defendant U of M, through words, actions, or procedures, instills in an employee, such as Dr. Patil, a legitimate expectation of adherence and offered policies. *Id.*

712.    Defendant U of M made policy statements to its employees, including Dr. Patil, through written policies, including the Standard Practice Guide and the Medical Bylaws.

713.    Defendants' violations of the Medical Staff Bylaws from 2019-2021 and the Fair Hearing Plan from 2021-2022 constitutes a breach of contract.

714.    Defendants repeatedly breached that contract by ignoring specified procedural requirements of the Standard Practice Guide and the Bylaws. Defendants committed.

715.    Dr. Patil had legitimate expectations that Defendant U of M would adhere to these policies and act accordingly at all times material hereto.

716.    Despite these express policy statements, Defendants' treatment of Dr. Patil was in direct contravention of the policies and procedures of Defendant U of M.

717.    The wrongful and unlawful actions of Defendant U of M were contrary to the expressed and detailed policies and procedures as outlined herein.

718.    Defendant U of M's wrongful and unlawful actions are in breach of its policies as set forth herein.

719.    U OF M Policy 04-06-041, *Institutional Requirements for Medical Staff Members, Clinical Program Trainees, and Physician Assistants*, requires an Annual Performance Planning & Evaluation Review. This reviews accomplishments of a member of the Medical Staff during the preceding fiscal year (July 1 - June 30), completed by the Department Chair and the Clinical Faculty member by September 1 of each year. The Annual Performance Review includes at least an assessment of competence, completion of institutional requirements, a plan for development, and

163

the establishment of goals for the next review period. For Dr. Patil, Annual Evaluations were not performed in a timely fashion, if at all, over multiple years. There was no Evaluation scheduled in 2014, 2020, or 2021. Written feedback was not provided in 2017 or 2018 (some comments for 2017 were provided in December 2019).

720.   As the Policy is not implemented as intended, Annual Evaluations are inaccurate, particularly with respect to financial data, over multiple years.

721.   The Departmental Investigation was guided by Defendant U of M Policy 04-06-052 which calls for a period of focused review that is time-limited, not to exceed 8 months.

a.   The Committee did not follow this policy.

b.   Instead of a focused review, the Committee reviewed all (222) of Dr. Patil's operative cases for one entire academic year and all (33) procedures for 5 years for microvascular decompression.

722.   Defendants' violations of the Medical Staff By-Laws constitute a breach of contract.

723.   In addition to not following the guiding Policy, existence of a process to ensure the objectivity of Departmental Committee members is not apparent.

164

a. Authority to form the Committee and to conduct the investigation was invested by Defendant Lozon in the same individuals (Defendant Sullivan and Defendant Muraszko) who were reported for unprofessional behavior.

b. The Chief of Service charged with ensuring that there were no conflicts of interest was the same Defendant Sullivan who verbally abused and publicly humiliated Dr. Patil less than a year before.

724.   Defendants repeatedly breached that contract by ignoring specified procedural requirements of the By-Laws and by committing other specified violations of the By-Laws.

725.   Two cases of abuse were reported to Defendant Muraszko, and in both cases Defendant Muraszko took no action.

726.   An Office of Clinical Affairs Report was filed, but there appears to have been no Investigation.

727.   By failing to follow its own policies, Defendant U of M failed to ensure the objectivity of the Investigation.

728.   The Departmental Investigation was notable for its deviation from standard practices. On a telephone call with Dr. Patil on December 19, 2019,

165

Defendant Lozon admitted to Dr. Patil the striking and uncharacteristic nature of the Department of Neurosurgery Investigation of his practice.

729.   A process to ensure that accuracy and transparency are maintained is also not apparent in the work of the Departmental Committee.

730.   The policy requires that the "measures employed to identify and resolve performance issues are clearly defined and consistently implemented."

731.   However, the charge to the Committee by Defendant Muraszko and Defendant Sullivan was extremely broad: to determine whether Dr. Patil met the standard of care for patient safety in his Neurosurgical practice.

732.    As with the Intradepartmental Investigation, the existence of a process to ensure the objectivity and accuracy of the Departmental Investigation, its composition, record-keeping, and interviews is not apparent.

733.   Defendant U of M Policy 04-06-052 requires that confidentiality be maintained. Professional practice evaluation information is available only to authorized individuals who have a legitimate need to know this information, based upon their responsibilities as a Medical Staff leader, U OF M employee, consultant, or other Individual properly participating in professional practice evaluation.

734.   Those individuals shall have access to the information only to the extent necessary to carry out their assigned duties. Any breach of confidentiality of the

166

records, data, knowledge, discussions, or deliberations of Professional Review activity is considered outside appropriate standards of conduct for Defendant U of M personnel and is grounds for corrective action.

735.   Confidentiality was not maintained during this entire process.

736.   As a direct and proximate result of Defendants' breach of contract, Dr. Patil has suffered irreparable harm, injury and damages, including but not limited to loss of career opportunities and earning capacity; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT XII
## INVASION OF PRIVACY

737.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

738.   Defendants, against their own company Policies, released information regarding an Investigation of Dr. Patil to other colleagues, including residents who Dr. Patil is expected to teach and train.

739.   The information that Defendants released was that regarding the Investigations, intentionally shared with a Resident Trainee by an attending Neurosurgeon, prompting fear that working with Dr. Patil would destroy the Trainee's career.

740.   The Resident shared the additional fear that divulging the breach to Dr. Patil would result in retaliation from the other attending Neurosurgeon.

741.   The damage and fear were very real and intense for the trainee and for Dr. Patil.

742.   In an unprecedented action and for the first time in 15 years, some Residents ignored Dr. Patil's emails.

168

743.   Information was also released during the hearing involving personal domestic matters not germane to his professionalism or clinical skills in an effort to weaken Dr. Patil's resolve to continue his pursuit of the fair hearing.

744.   This information was private to Dr. Patil and of no concern to others, including those who received that information.

745.   The information disclosed was that which involved the existence of secret and private subject matters according to Defendants' own Protocol.

746.   Dr. Patil had a right to keep such subject matters private.

747.   The disclosure of this information, along with the way in which it was obtained by third parties, took place in a manner and method objectionable to any reasonable person.

748.   The manner and method of such disclosure, along with the content of what was disclosed, is highly offensive to a reasonable person and of no legitimate concern to the public or the recipients.

749.   The information disclosed placed Dr. Patil in a false light to the recipients and the public eye. This included, but was not limited to, a pending Investigation and the false assertion that he was absent due to illness. Even if the latter statement were true, which it was not, the elements for invasion of privacy

would be met by such a disclosure especially since these statements were made without his consent or approval.

750.   This also included information about Dr. Patil's personal family life and past relationships, which was aired out in a shameless and salacious manner during his cross examination at the so-called fair hearing in front of all his colleagues and subsequently determined to be wholly irrelevant to the issues before the panel.

751.   This information was private to Dr. Patil and of no concern to others.

752.   The failure to maintain confidentiality introduce a presumption of guilt and in-group bias, since Dr. Patil would be viewed as an outsider or opponent.

753.   Defendant Muraszko deliberately and secretly removed Dr. Patil, without notification, from the group email list that is used to conduct most important Neurosurgery business.

754.   Falsely stated that Dr. Patil was absent for months from 2019-2022 due to illness, casting doubt on his health and ability to perform his duties as a surgeon, thereby lowering his reputation in the community and deterring patients and practitioners from associating or dealing with him. This information was circulated widely and without privacy protections in the Department, the institution, and the field of Neurosurgery.

170

755.    In doing so, Dr. Patil's reputation and details of the investigation(s) were published in a false light to patients and referring physicians.

756.    In doing so, Defendants violated strict confidentiality rules on acquiring and disclosing an employee's medical information.

757.    This includes, but is not limited to disclosing such information to individuals who had no legitimate need to know and engaging in the unlawful disclosure of private medical information to other employees and patients.

758.    Defendants' invasion of Dr. Patil's privacy as detailed in the preceding Paragraphs caused Dr. Patil to suffer extreme emotional distress and humiliation.

759.    As a direct and proximate result of invasion of privacy, Dr. Patil has sustained injuries and damages, including the loss of earnings and earning capacity, loss of fringe and pension benefits, mental and emotional distress, humiliation and embarrassment; loss of career opportunities; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as

171

well as both compensatory and non-monetary damages as outlined in this Second

Amended Complaint, and an order awarding Plaintiff any other equitable relief as

this Honorable Court deems appropriate at the time of final judgment.

## COUNT XIII
## DEFAMATION

760.   Plaintiff repeats and realleges all foregoing paragraphs as if they were

fully set forth herein.

761.   Defendants made false and defamatory statements, without justification

or excuse, concerning Dr. Patil to third parties in unprivileged communications and

publications, causing harm to Dr. Patil and his reputation.

762.   Defendants negligently made the following false statements:

a. That Dr. Patil was absent for months due to illness, presumably

continuing for years throughout 2022 as he was unable to return and

operate, casting doubt on his health and ability to perform his duties as

a surgeon, thereby lowering his reputation in the community and

deterring patients and practitioners from associating or dealing with

him. This information was circulated widely and without privacy

protections in the Department, the institution, and the field of

Neurosurgery.

172

b.  From 2019 and continuously through 2022, that Dr. Patil was unfit to practice, that his clinical privileges were denied because he is a threat to patient safety, that he was on administrative leave, with the same negative effect.

c.  The National Practitioner Data Bank (NPDB) to which the Defendants reported includes false and inaccurate information that Defendants volunteered to be made to the general public in September 2020 and continuing to this present day without retraction or correction.

d.  In March 2021, and continuing to this present day without any retraction or correction, Defendants also falsely alleged violations of the Michigan Public Health Code to the Department of Licensing and Regulatory Affairs, including an "Immediate threat to health or safety" of patients and "substandard or inadequate care" based on "information questioning [Dr. Patil's] clinical competence and professional behavior."

e.  These statements were false, made with malicious intent, and in response to Dr. Patil's inquiries about recommendations to a behavioral institute.

f.  These statements in parts (a) and (b) made by Defendants were untrue.

173

g.  These statements were then re-stated and published to a targeted audience as well as the general public.

h.  Defendants have no intention of retracting or removing these statements from the NPDB.

i.  Even if these statements are "proven false" the Defendants will only include a "supplemental note" of Dr. Patil's challenge to these claims.

763.  The statements were not privileged.

764.  The statements were made in some cases negligently, and on certain occasions, false statements were made intentionally, recklessly, and maliciously.

765.  The statements resulted in harm to Dr. Patil.

766.  Defendants knew or acted in reckless disregard as to the falsity of such statements and the false light in which the Dr. Patil would be placed.

767.  Defendants continued to make these statements to supplement their previously false claims, including reports filed as recently as 2023.

a.  Defendants' report to the NPDB was not merely a matter of mandatory reporting, but rather a false, defamatory report that was malicious in both substance and its timing:

b.  Defendants recently issued another report to the NPDB indicating that he "*allowed his clinical privileges to lapse while under*

174

*investigation*"(Emphasis added).

    c.  This is a falsehood that can also be debunked by documentation and other evidence. It is a false statement filed in the National Practitioner Data Bank.

    d.  Another report was recently filed in 2023 that created a series of systematic errors that inflated concerns.

768.  As a direct and proximate result of Defendants' defamatory statements, Dr. Patil has sustained injuries and damages, including the loss of earnings and earning capacity, loss of fringe and pension benefits, mental and emotional distress, humiliation and embarrassment; loss of career opportunities; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second

Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT XIV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

769.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

770.   Defendants' actions, statements, and conduct towards Dr. Patil, as outlined in this Second Amended Complaint, were, and continue to be, extreme, outrageous, and beyond the bounds of common decency.

771.   Defendants intentionally acted either with the purpose of inflicting injury or without thinking or caring about the consequences of these actions for Dr. Patil.

772.   Defendants' conduct caused Dr. Patil severe emotional distress.

773.   As a direct and proximate result of Defendants' Intentional Infliction of Emotional Distress, Dr. Patil has sustained injuries and damages, including the loss of earnings, and earning capacity, loss of fringe and pension benefits, mental and emotional distress, humiliation, and embarrassment; loss of career opportunities; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## COUNT XV
## VIOLATION OF THE BULLARD PLAWECKI
## EMPLOYEE RIGHT TO KNOW ACT, M.C.L. §432.501 *ET SEQ.*

774.   Plaintiff repeats and realleges all foregoing paragraphs as if they were fully set forth herein.

775.   Dr. Patil and his counsel have repeatedly made verbal and written requests for Dr. Patil's personnel file and other documentation that will likely be a part of his employee file.

776.   On May 2, 2019, when Dr. Patil requested to see employee files kept by the Office of Clinical Affairs, Defendant Lozon falsely denied that OCA kept any files on Dr. Patil.

177

777. Dr. Patil, under M.C.L. § 432.501 *et seq.,* is entitled the opportunity to secure copies of his complete personnel file.

778. Under M.C.L. § 423.503, Defendant U of M was required to provide Dr. Patil with an opportunity to review and inspect that personnel record upon his request.

779. Defendant U of M's denial of the request was a willful and knowing violation of the Act.

780. These acts were in violation of the spirit of M.C.L. §§ 423.503 and 423.511.

781. After files were eventually delivered to Dr. Patil's counsel, a request was made for an authorized individual working for Defendant U of M to certify that this was a full, complete copy of his employment file, that was not altered in any way since the initial request was made.

782. This request was denied, and Defendant U of M refused to provide any representation indicating that it delivered a complete and unaltered employee file.

783. As a result of Defendant U of M's deliberate, willful, knowing, and unlawful acts, Dr. Patil is entitled to damages under M.C.L. § 423.511.

784. Pursuant to M.C.L. § 423.511, Dr. Patil is entitled to actual damages, as well as statutory damages and attorney fees.

**WHEREFORE,** Plaintiff is entitled to actual damages, statutory damages, costs, and reasonable attorney fees. Plaintiff requests this Honorable Court to enter a judgment in favor of Plaintiff, against all Defendants, jointly and severally for damages in the amount Plaintiff is found to be entitled, including but not limited to Plaintiff's full and unconditional reinstatement to his position without restrictions as well as both compensatory and non-monetary damages as outlined in this Second Amended Complaint, and an order awarding Plaintiff any other equitable relief as this Honorable Court deems appropriate at the time of final judgment.

## VI. REQUESTED RELIEF

For these reasons, Plaintiff asks the Court to:

1. Award Plaintiff at least Twelve Million ($12,000,000) Dollars compensatory damages in whatever amount he is found to be entitled; and

2. Award Plaintiff exemplary damages in whatever amount he is found to be entitled; and

3. Award Plaintiff at least Fifty Million ($50,000,000) Dollars punitive damages in whatever amount he is found to be entitled; and

4. Award Plaintiff interest, costs, reasonable attorney fees, and expert witness fees.

5. Enjoin Defendant(s) to restore Plaintiff's Clinical Privileges, Leadership

179

Positions, and Access to the Operating Room; and

6.  Enjoin Defendant(s) to endorse Plaintiff's Professionalism and Professional Standing for American Board of Neurological Surgery Continuous Certification; and

7.  Enjoin Defendant(s) to clear Plaintiff of any wrongdoing in the National Practitioner Data Bank and with the Michigan Department of Licensing and Regulatory Affairs, including submission of a full retraction statement; and

8.  Enjoin Defendant(s) to provide Plaintiff with a written letter clearing him of any wrongdoing; and

9.  Enjoin Defendant(s) to promote Plaintiff to Full Professor with Tenure of Neurosurgery, Neurology, Anesthesiology, and Biomedical Engineering; and

10. Enjoin Defendant(s) by ordering that no salary reduction be implemented against Dr. Patil while this matter is pending and that all administrative and leadership roles that were held by Dr. Patil remain in the status quo until this pending litigation is resolved and/or concluded.

11. Drs. Murazsko and Lozon are within their powers in their respective roles, and an evidentiary hearing and/or cross-examination under oath would

180

establish, that they would have the ability to provide such remedies—including a proper modification and/or retraction of the NPDB reports and restoration of his clinical privileges.

12. Dr. Muraskzo (as Chair of Neurosurgery at the time) and Dr. Lozon (Chief of Staff, Chair of ECCA, Head of OCA) wield tremendous authority and influence to individually and collectively restore Dr. Patil's clinical staff privileges, clear him of wrongdoing with the federal and state agencies, and/or promote him—especially when provided with the directive through a ruling issued by this honorable court.

13. Defendant Regents, when provided with the directive through a ruling issued by this honorable court, can also direct Dr. Lozon, in her official capacity and various critical leadership roles within Michigan Medicine, to restore Dr. Patil's clinical staff privileges, clear him of wrongdoing with the federal and state agencies, and/or promote him.

14. Award such other relief deemed just and proper by the Court.

## VII. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, we certify to the best of our knowledge, information, and belief that this Second Amended Complaint: (1) is not being presented for an improper purpose, such as to harass,

181

cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Second Amended Complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted,

/s/ *Ronald G. Acho*
Cummings, McClorey, Davis & Acho, P.L.C.
17436 College Parkway
Livonia, MI 48152
(734) 261-2400
Attorneys for Plaintiff
Dated: July 21, 2023    Email: racho@cmda-law.com
P-23913

-and-

Saif R. Kasmika
Midwest Legal Partners, PLLC
42705 Grand River Avenue
Suite 201
Novi, MI 48375
Dated: July 21, 2023    (248) 344-4570
Attorneys for Plaintiff
Email: skasmikha@midwestlegalpartners.com
P-74320

182

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PARAG G. PATIL, M.D., Ph.D.,

     Plaintiff,

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN,
MARIE LOZON, M.D., Individually,
KARIN MURASZKO, M.D., Individually,
and STEPHEN SULLIVAN, M.D.,
Individually,

     Defendants.

CASE NO. 23-cv-10631-MAG-DRG
Hon. Mark A. Goldsmith
Mag. Judge David R. Grand

_____/

## <u>RELIANCE ON DEMAND FOR TRIAL BY JURY</u>

**NOW COMES** the Plaintiff, PARAG G. PATIL, M.D., Ph.D., by and through his attorneys, CUMMINGS, McCLOREY, DAVIS & ACHO, PLC by RONALD G. ACHO, JAMES R. ACHO and MIDWEST LEGAL PARTNERS, LLC, by SAIF R. KASMIKHA, and hereby relies upon the demand of a trial by jury previously filed in the above-entitled cause of action.

Respectfully submitted,

/s/ *Ronald G. Acho*
Cummings, McClorey, Davis & Acho, P.L.C.
17436 College Parkway
Livonia, MI  48152
(734) 261-2400
Attorneys for Plaintiff
Dated: July 21, 2023         Email: racho@cmda-law.com
P-23913

-and-

Saif R. Kasmika
Midwest Legal Partners, PLLC
42705 Grand River Avenue
Suite 201
Novi, MI   48375
Dated: July 21, 2023         (248) 344-4570
Attorneys for Plaintiff
skasmikha@midwestlegalpartners.com
P-74320

2